# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG DIVISION

|  |  |  |
|---|---|---|
| **STATE OF OHIO,** | : | CASE NO: ___1:23-CV-100___ |
| 30 E. Broad St., 26th Floor | : | |
| Columbus, OH 43215 | : | JUDGE ___Kleeh___ |
| | : | |
| **STATE OF COLORADO,** | : | |
| 1300 Broadway, 7th Floor | : | ELECTRONICALLY FILED |
| Denver, CO 80203 | : | 12/07/2023 |
| | : | U.S. DISTRICT COURT |
| **STATE OF ILLINOIS,** | : | Northern District of WV |
| 100 West Randolph Street | : | |
| Chicago, IL 60601 | : | |
| | : | |
| **STATE OF NEW YORK,** | : | **COMPLAINT FOR INJUNCTIVE** |
| 28 Liberty Street | : | **RELIEF** |
| New York, NY 10005 | : | |
| | : | |
| **STATE OF NORTH CAROLINA,** | : | |
| 114 W. Edenton Street | : | |
| Raleigh, NC 27603 | : | |
| | : | |
| **STATE OF TENNESSEE,** | : | |
| P.O. Box 20207 | : | |
| Nashville, TN 37202 | : | |
| | : | |
| **STATE OF WEST VIRGINIA,** | : | |
| P.O. Box 1789 | : | |
| Charleston, WV 25326 | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NATIONAL COLLEGIATE** | : | |
| **ATHLETIC ASSOCIATION** | : | |
| 700 W. Washington Street | : | |
| P.O. Box 6222 | : | |
| Indianapolis, IN 46206-6222 | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## COMPLAINT FOR INJUNCTIVE RELIEF

1.       The States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia bring this action to challenge Bylaw 14.5.5.1 ("Transfer Eligibility Rule") of Defendant, the National Collegiate Athletic Association ("NCAA"). This bylaw imposes a one-year delay in the eligibility of certain college athletes transferring between NCAA member institutions and unjustifiably restrains the ability of these college athletes to engage in the market for their labor as NCAA Division I college athletes. This action seeks declaratory and injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION

2.       NCAA member institutions and their college athletes engage in intense competition on and off the field. The contests that take place on fields and courts across the nation are the most visible.  But off the field, schools compete to recruit and retain talented college athletes, and college athletes compete to market their labor to the schools of their choice.

3.       In the time since the NCAA's founding in 1906, the scope and subject matter of its rules governing intercollegiate sports have expanded significantly. It has not only adopted rules to ensure the actual contests on the field are fair and safe, but it has also created rules that control off-the-field competition among its members and college athletes. Although some of these rules may be necessary to administer college sports, rules that unreasonably restrict competition between competitors, with no overriding procompetitive benefit, run headlong into this nation's antitrust laws which are premised on the belief that market forces provide the best outcomes.

4.       One such NCAA rule is the Transfer Eligibility Rule, which restricts the eligibility of college athletes who transfer between Division I schools. The NCAA claims that

2

this Rule promotes academic well-being of college athletes and preserves its amateurism model. But the connection between the Rule and academic well-being or athletic amateurism is tenuous at best and is outweighed by the harm it does to college athletes and consumers of college athletics. In the language of antitrust law, the Transfer Eligibility Rule is a no-poach agreement between horizontal competitor member schools that serves to allocate the market for the labor of NCAA Division I college athletes. This agreement plainly violates the Sherman Act. The fact that it was created under the auspices of the NCAA does not shield it from antitrust scrutiny. In contrast to college athletes, students with academic or music scholarships can freely transfer institutions without facing similar restraints on their ability to practice their craft. Likewise, coaches and administrators face no comparable barriers.

5.      The Transfer Eligibility Rule requires a year of academic residency before a transferring Division I college athlete is eligible to participate in NCAA athletic competition. Underscoring its anticompetitive nature, the rule is not universally applied. A college athlete's first transfer is excepted from this process, and there is a discretionary waiver process. But the Rule remains the default for Division I college athletes who transfer a second time.

6.      For NCAA college athletes, a one-year waiting period for eligibility can be devastating. This amounts to 20% of the total time allotted by NCAA regulations for the completion of the college athlete's total seasons of eligibility. Furthermore, only by competing on the field or court can the college athlete receive the full benefits of participation in Division I NCAA athletics.

7.      The Transfer Eligibility Rule artificially deters players and teams from achieving optimal matches by forcing college athletes to weigh the one-year ineligibility period against the benefits of moving to a better matched school. It is ironic that this rule, stylized as promoting the

welfare of college athletes, strips them of the agency and opportunity to optimize their own welfare as they see fit.

8.      Though the NCAA is an association of member institutions that compete against each other to attract revenues, fans, and college athletes, it has enacted and enforced anticompetitive rules and policies that act as an unlawful barrier on the ability of certain college athletes and universities to compete against each other.

9.      Plaintiff States bring this action to put a stop to Defendant's unjustified overreach into the lives and careers of college athletes, to prevent the unjustified anticompetitive restriction on universities who seek to compete for college athletes, and to restore freedom of economic opportunity.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

11.      This Court may exercise personal jurisdiction over Defendant because Defendant currently transacts business in the Clarksburg Division of the Northern District of West Virginia. Defendant and its member institutions conduct athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the Northern District of West Virginia.

12.      Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

## THE PARTIES

13.     The Attorneys General of the Plaintiff States bring this action in their quasi-sovereign capacities as the chief law enforcement officers of their respective states.

14.     Plaintiff States have quasi-sovereign interests in protecting their citizens, including but not limited to college athletes and the consumers of college athletics, from economic harm and in ensuring that their economies and the labor markets therein are not suppressed by unjustified restraints of trade.

15.     The Plaintiff States are granted authority to bring actions for injunctive relief under federal antitrust law pursuant to 15 U.S.C. § 26.

16.     Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,000 member colleges and universities throughout the United States, including institutions in each of the Plaintiff States. These member institutions are organized into three divisions, and Division I includes over 350 schools. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaw at issue in this case, Division I Bylaw 14.5.5.1. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

17.     As a practical matter, an academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the

NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously-earned wins, monetary fines, and the so-called "death penalty."

18.     The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for an undergraduate academic education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

19.     There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from name, image, and likeness ("NIL") agreements, and (vii) competition at the highest level of collegiate athletics.

## **BACKGROUND**

### *The Transfer Eligibility Rule, NCAA Bylaw 14.5.5.1*

20.     The NCAA and its member institutions are organized under a constitution and divided into three divisions. NCAA, *Division I 2023-24 Manual*, 3 (accessed Nov. 2, 2023), https://web3.ncaa.org/lsdbi/reports/getReport/90008, included in this filing as Exhibit A. Each of the NCAA's three divisions has the authority to determine its own governing structure and

membership. *Id.* at 5. The NCAA is overseen by a Board of Governors which appoints the President to administer the Association and "implement directions of the Board of Governors and divisional leadership bodies." *Id.* at 4. Each member institution is required to "hold itself accountable to support and comply with the rules and principles approved by the membership." *Id.* at 9.

21.    Each NCAA division maintains its own legislative process for adopting bylaws, with some bylaws applying to only one division and others applying across divisions. *Id.* at 14. Proposed bylaw changes that move through the divisional legislative process within an "area of autonomy" as identified by the bylaws are adopted by certain conferences and their member institutions. *Id.* at 15. Federated legislation—changes that are applicable only to the adopting division—can be made by the Division I Council. *Id.* at 17. The Division I Council is comprised of representatives from member institutions and conferences. *Id.* at 396–397. Member institutions can propose amendments to the bylaws for the Division I Council's review and can comment on proposed amendments under consideration. *Id.* at 17–18.

22.    NCAA Bylaw 13.1.1.3.1 provides that for undergraduate college athletes that wish to transfer to a new member institution, the college athlete must provide notice to the current institution during a specified period for the college athlete's given sport. *Id.* at 75–76. After notification of intent to transfer, the current institution must "enter the [college athlete's] information into the national transfer database," a process known as the NCAA Transfer Portal. *Id.* at 75. According to a recent NCAA statement, 21,685 college athletes had entered the transfer portal in 2023 as of September 12. *DI Board Statement Regarding Transfer Waivers*, NCAA (Sept. 12, 2023), available at: https://www.ncaa.org/news/ 2023/9/12/media-center-di-board-statement-regarding-transfer-waivers.aspx.

23.     NCAA Bylaw 14.5.5.1, herein referred to as the Transfer Eligibility Rule, states,

"A transfer student from a four-year institution shall not be eligible for intercollegiate

competition at a member institution until the student has fulfilled a residence requirement of one

full academic year (two full semesters or three full quarters) at the certifying institution." Exhibit

A at 165. This rule does not prevent a college athlete from practicing or participating in other

team activities during this one-year waiting period, only from competing on gameday. *Id.* One

exception to this rule found in NCAA Bylaw 14.5.5.2.10 exempts college athletes transferring

for the first time from the Transfer Eligibility Rule. *Id.* at 167. NCAA Bylaw 12.8.1 provides that

college athletes have five calendar years to complete their four seasons of eligibility in any one

sport. *Id.* at 55.

24.     The NCAA Bylaws contain what is commonly known as the "Rule of Restitution,"

which provides:

> If a student-athlete who is ineligible under the terms of the
> bylaws or other legislation of the Association is permitted to
> participate in intercollegiate competition contrary to such NCAA
> legislation but in accordance with the terms of a court restraining
> order or injunction operative against the institution attended by such
> student-athlete or against the Association, or both, and said
> injunction is voluntarily vacated, stayed or reversed or it is finally
> determined by the courts that injunctive relief is not or was not
> justified, the Board of Directors may take any one or more of the
> following actions against such institution in the interest of restitution
> and fairness to competing institutions:
>     (a) Require that individual records and performances
> achieved during participation by such ineligible student-athlete shall
> be vacated or stricken;
>     (b) Require that team records and performances achieved
> during participation by such ineligible student-athlete shall be
> vacated or stricken;
>     (c) Require that team victories achieved during participation
> by such ineligible student-athlete shall be abrogated and the games
> or events forfeited to the opposing institutions;
>     (d) Require that individual awards earned during
> participation by such ineligible student-athlete shall be returned to

the Association, the sponsor or the competing institution supplying same;

(e) Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f) Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g) Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

*Id.* at 66–67. This rule allows the NCAA to punish college athletes and their member universities for actions taken in accordance with court orders if those orders are later revoked. *Id.*

25.     Because of the commercial nature of the transactions between college athletes and NCAA member institutions and the effect these transactions have on college athletes and the consumers of college athletics, the NCAA's enforcement of the Transfer Eligibility Rule falls within the purview of the Sherman Act. The Transfer Eligibility Rule's anticompetitive effects within the sport-specific markets for the labor of NCAA Division I college athletes far outweigh the pretextual procompetitive benefits, and the Rule is an unreasonable restraint of trade that cannot survive rule of reason analysis.

## RELEVANT MARKETS

26.     Within NCAA Division I athletics, the Transfer Eligibility Rule affects two broad categories of labor markets: (1) athletic services in men's and women's Division I basketball and football bowl subdivision ("FBS") football, wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market. Within these markets, college athletes compete for spots on NCAA Division I member institution athletic teams, while the NCAA member institutions simultaneously compete to secure elite-level college athletes. In so doing, the NCAA member institutions secure the labor of these college athletes through in-kind benefits—specifically, scholarships, academic programs, access to modern training facilities, and knowledge and training from premier coaching staffs.

27.     The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

28.     Participation in NCAA Division I athletic events on gameday significant benefits to a college athlete. College athletes can showcase their skill in front of national audiences, gain exposure to professional team scouts, and compete against other college athletes at the highest level of collegiate athletics. In addition, the recent advent of NIL agreements presents college athletes the opportunity to benefit financially—sometimes in the millions of dollars—while playing college sports.

29.     As mentioned above, there are no practical alternatives to the Division I level of NCAA athletics for college athletes who seek to market and showcase their elite-level skills. The benefits that come with participation in NCAA Division I athletics include the ability to

exchange athletics services for (i) the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

30.     Within these relevant markets, the NCAA maintains exclusive power, dictating the rules and regulations for participation in Division I athletics through the Division I Council and NCAA member institutions.

31.     Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college athletes. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## ANTICOMPETITIVE EFFECTS

32.     The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports.

33.     The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college athletes.

34.     Despite what the NCAA may claim, the Transfer Eligibility Rule restrains college athletes from freely moving among member institutions to improve their economic opportunity, personal growth, and well-being, a freedom afforded to other students at NCAA member institutions but not to college athletes. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and consumers of college athletics.

### *The Transfer Eligibility Rule's Effects on College Athletes*

35.     College athletes compete within the relevant markets of their respective sports for scholarships at NCAA Division I member institutions. Within these markets, college athletes are harmed by the Transfer Eligibility Rule. Effectively, the Transfer Eligibility Rule operates as a no-poach, market allocation agreement among the NCAA and its member institutions for the labor of NCAA Division I college athletes. The Transfer Eligibility Rule harms college athletes in three main areas of the relevant markets: (1) when college athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend, and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution.

36.     First, the Transfer Eligibility Rule harms college athletes by discouraging them from transferring to a different institution that may benefit their academic, mental, and athletic well-being. Because of the Transfer Eligibility Rule, college athletes are denied the freedom of choice among Division I schools once they have competed on behalf of a given school. They are

prevented from competing at a school to which they might choose to transfer for an entire year, denying them the benefits of competing in NCAA athletic events. This equates to a 20% loss of the time given to them to complete their seasons of eligibility and compete in the highest level of collegiate athletics.

37.     With the threat of a year of ineligibility looming over transfer decisions, college athletes may hesitate to transfer even when a different institution may offer a situation that is better for the college athlete than the situation at the current institution. College athletes, just like non-athlete college students, may desire to transfer schools for any number of reasons. Distance from family, struggles with mental health, or better academic or athletic opportunities elsewhere are just a few of the many reasons college athletes may seek a transfer. The Transfer Eligibility Rule creates friction in the relevant markets by deterring college athletes from exploring better options within their sport-specific market.

38.     Second, the Transfer Eligibility Rule affects college athletes in the relevant markets by artificially disadvantaging second-time transfers. Just like college athletes compete within the relevant markets for scholarship positions on Division I athletic teams, NCAA member institutions compete against each other to attract and retain elite college athletes to compete on the institutions' athletic teams. Second-time transferring college athletes are not able to apply for a waiver of the Transfer Eligibility Rule until after they have been accepted and enrolled at their new institution. Because the waiver process is discretionary and has been inconsistently applied, member institutions that accept a second-time transfer risk that the college athlete might not be eligible to compete for an entire academic year. This distorts the market by artificially deflating the value of a second-time transfer.

39.     In some instances, college athletes may have no choice but to transfer or risk losing a scholarship at their current institution. Head coaches can essentially force a player into the transfer portal by threatening to cut a player and revoke their scholarship, making the choice to transfer no real choice at all. In such situations, college athletes that have already transferred once, making them unqualified for the first-time transfer exception, must face the consequences of the Transfer Eligibility Rule despite having no control over the situation at their current institution. Such situations force college athletes into a transfer market where, compared to transfers who qualify for the first-time exception, they face an artificial competitive disadvantage because of the Transfer Eligibility Rule.

40.     Third, the Transfer Eligibility Rule harms college athletes transferring a second time by denying them the opportunity to compete in NCAA Division I athletic events for an entire academic year after transferring to a new institution. NCAA Division I sports are the pinnacle of college athletics in the United States. Competing at this high level of athletics comes with immeasurable opportunities for personal, professional, and economic growth. For athletes seeking to continue competing professionally after college, NCAA Division I sports provide a platform to showcase athletic skills in front of national audiences and professional scouts. The Transfer Eligibility Rule unjustifiably denies these benefits to affected student athletes for an entire academic year.

41.     The NCAA has often noted the importance of its college athletes' opportunities to compete at the highest level.  *See, e.g.*, *The Value of College Sports*, NCAA (last visited Nov. 10, 2023), https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (where the NCAA expressly notes that the value of college sports to its college athletes includes unparalleled exposure and experiences through "the opportunity to travel across the country and around the

14

world for regular-season contests, NCAA championships and foreign tours," which "can open

doors for the few who will compete professionally and for the majority who will go pro in

something other than sports.").

42.     While college athletes subject to the Transfer Eligibility Rule's restrictions are

allowed to practice and participate in other team activities, they are expressly restricted from

competing in their sport. Practicing with one's teammates and competing on gameday are not the

same thing. Competition is fundamentally different. Even the NCAA's public statements support

this point:

> NCAA tournaments are where dreams are fulfilled, lifelong
> memories are made and communities come together under a shared
> love for the game. Seeing college athletes, both in victory and
> defeat, competing with passion and conviction wins our hearts long
> after the clock hits zero. Simply put, championships represent the
> very best of college athletics.
> This deserves to be felt at every juncture. Transformation
> Committee members evaluated differences that exist across sports
> to find ways to improve equity and bring these experiences closer
> together. **We recognized that championships are the pinnacle of
> a [college athlete's] Division I experience and sought to grant
> greater access to championships for well-qualified teams while
> honoring the existing structure for entry.** For travel to
> championships, our goal was to create new, elevated
> recommendations so teams and college athletes would have a
> comparable experience when traveling, regardless of sport or
> gender.

NCAA, *NCAA Division I Transformation Committee Final* Report, 14 (Jan. 3, 2023),

https://ncaaorg.s3.amazonaws.com/committees/d1/transform/Jan2023D1TC_FinalReport.pdf

(where Lynda Tealer, a member of the Division I Transformation Committee and executive

associate athletics director at the University of Florida, reemphasized the importance of

competition at the highest level) (emphasis added).

43.     Moreover, college athletes' opportunities to show the world the fruits of their labor occur on fields, courts, and rinks where the NCAA has unlawfully restricted their participation. Forced ineligibility and missing even a single game can negatively impact a college athlete's future earning potential. National television broadcasts provide significant exposure for college athletes. One game can take a college athlete from a local fan favorite to a household name. When even the slightest differences among players can affect positioning and earning potential in professional league drafts, every game is vital for college athletes and can significantly impact their future earning potential.

44.     Apart from future earning potential, the Transfer Eligibility Rule impairs college athletes' ability to take advantage of current and future opportunities derived from their name, image, and likeness. NIL agreements may vary depending on the school at which an athlete competes (and the NIL-related resources a school might provide), the degree of exposure that the athlete might expect from playing sports at that school, the relationships a given school might have with third parties interested in entering NIL agreements (through collectives or otherwise), and ties to established media markets in which NIL agreements may be more prevalent, among other factors. By limiting eligibility for affected college athletes, the Transfer Eligibility Rule prevents these college athletes from maximizing NIL valuations, which can run into the millions of dollars. The Transfer Eligibility Rule's restrictions for an entire academic year can have immeasurable and lasting economic effects on college athletes.

45.     In addition to the potential economic effects on these college athletes and the dramatic impact these restraints have on the college athletes' overall collegiate athletics experience, the NCAA's denial of college athletes' ability to compete immediately through

enforcement of the Transfer Eligibility Rule has caused negative impacts on the mental health and overall well-being of some college athletes.

46.     There are numerous college athletes whose academic and athletic aspirations are being unlawfully restrained by the Transfer Eligibility Rule; the NCAA, media, and consumers of college athletics are well aware of this issue as evidenced by recently publicized examples of college athletes harmed by the Transfer Eligibility Rule.

### *RaeQuan Battle*

47.     RaeQuan Battle is a member of the West Virginia University ("WVU") Men's Basketball Team. Before joining WVU, he played basketball at the University of Washington for the 2019-20 and 2020-21 basketball seasons. Thereafter, he transferred to Montana State University ("MSU") and played there during the 2021-22 and 2022-23 basketball seasons.

48.     Because Mr. Battle had transferred on a prior occasion, his ability to transfer to WVU from MSU for the 2023-24 basketball season was restricted by the Transfer Eligibility Rule. Thus, to be eligible to play immediately, he needed to have a waiver approved by the NCAA. WVU applied for him to receive a waiver for immediate eligibility, as he and WVU believed that his circumstances fit within the NCAA's criteria for waiver requests.

49.     However, the NCAA recently denied his appeal for immediate eligibility at WVU. Mr. Battle is completely devastated by the NCAA's decision to deny him eligibility for the 2023-24 basketball season. Losing his coach at MSU, which prompted his decision to transfer to WVU, is a situation that he had no control over and severely affected his mental health. The denial of competition only exacerbates this impact to his mental health and overall well-being.

50.     WVU is scheduled to play 31 regular season games during the 2023-2024 season. Mr. Battle is currently on the bench and has been unable to play in six competitive games thus far this season because of the Transfer Eligibility Rule. If he continues to be kept out of competition through December, then that would mean missing seven additional games (a total of 13 competitive games, which is almost half of the regular season schedule). Once these games have been played, they are gone forever. They will not be replayed in the future, and opportunities for development, exposure, and joy from participating in these contests are lost for Mr. Battle. Every passing game missed further irreparably harms Mr. Battle.

51.     Not participating in competitive games significantly impacts Mr. Battle's ability to pursue NIL compensation and for his chances to pursue a career in professional basketball.

### *Jarrett Hensley*

52.     Jarrett Hensley is a member of the Southern Illinois University ("SIU") Men's Basketball Team. Before joining SIU, Mr. Hensley played at the University of North Carolina Greensboro ("UNCG") until deciding to transfer to the University of Cincinnati ("UC"). Because the coach who recruited him to UNCG chose to leave UNCG for UC, Mr. Hensley made the decision to follow his coach to UC. While this was a difficult decision, Mr. Hensley's coach was the only real connection he had to UNCG, so he and his family felt that following his coach to UC was the right decision.

53.     The adjustment to basketball and school at UC was extremely difficult for Mr. Hensley, and he began to feel very depressed and anxious. After UC made the move to the Big 12 Conference, the level of competition and the amount of pressure Mr. Hensley put on himself only increased, as the pressure to win increased tremendously. As the coaches and staff started putting more emphasis on outcomes instead of focusing on his collegiate athlete experience, UC

staff encouraged Mr. Hensley to enter the transfer portal, and he felt that it was necessary to transfer somewhere closer to home and to family.

54.     Mr. Hensley feels like SIU coaches promote a family environment that makes him feel comfortable. As he knew he could make an impact and play on the SIU team, SIU was the right place for him as a student and athlete.

55.     Mr. Hensley worked with the UC compliance staff in preparation to file for a waiver of the Transfer Eligibility Rule, who assured him that he would be immediately eligible upon transferring. As such, when Mr. Hensley made the decision to enter the transfer portal, he was convinced that he would be able to play immediately at his new school.

56.     However, on the first day of school, SIU's coach had a meeting with Mr. Hensley to let him know that his waiver was denied. He was shocked, upset, and emotional. Being new to the school and having basketball taken from him led to stress and anxiety. There would be many nights that he didn't sleep at all. It made him question if he even wanted to continue playing, and he even had conversations with his coaches about potentially quitting the sport.

57.     Mr. Hensley ultimately decided to stay at SIU and see the waiver the process through. The process and the decision looms over him every day.  He struggles knowing that his season is in the hands of someone else and that he cannot do anything about it.

58.     If unable to compete for the 2023-2024 season, Mr. Hensley will miss 31 games plus any postseason contests. Many of these games will be televised. On December 5, 2023, Mr. Hensley was forced to sit out the first SIU home basketball game against a Power 5 conference opponent since 2007. Mr. Hensley knows he could have helped his team win that nationally televised game, but because of the transfer Eligibility Rule, he did not get the opportunity to

compete in that contest. He also missed out on the media coverage that could have helped him with potential NIL opportunities.

### Noah Fenske

59.     Noah Fenske is currently a member of the football team at SIU. He started his collegiate career at the University of Iowa on a football scholarship.

60.     Mr. Fenske left Iowa due to mental health concerns and decided to transfer to the University of Colorado.  While at Colorado, he dealt with mental health issues and sought counseling, as the environment at Colorado was difficult and the school transitioned through more than one coaching staff while he was on the team.

61.     The new coach at Colorado made it clear that current players were not going to be welcomed back after spring practices, and as such, Mr. Fenske had no choice but to look to transfer again in order to keep his scholarship.

62.     Mr. Fenske was advised that if he transferred to a lower-level school, he would be eligible, even if he was transferring for a second time. Despite receiving offers to play from Power 5 conference teams, he entered the transfer portal hoping to find a place like SIU where he could play football and finish his degree. He would not have transferred if he had not been pushed into the decision and told that he would be able to play immediately. He wanted to finish his degree at Colorado and was only one year away, but when he was told that he would not have a scholarship, he had no choice but to find another school.

63.     After arriving at SIU under the assumption he would be immediately eligible, Mr. Fenske was subsequently made aware that there had been a rule change, and that a waiver would have to be filed with the NCAA for immediate eligibility based on mental health struggles. To

apply for this waiver, Mr. Fenske was forced to relive and relate to the NCAA the difficult circumstances that led to his mental health struggles.

64.     Mr. Fenske had many coaches tell him he was good enough to enter the draft after the season, but as Mr. Fenske did not get to compete, no one had the opportunity to assess his talent. In total, he missed 11 regular season and two FCS Playoff games during the Fall 2023 season. Since his team was eliminated from the playoffs, Mr. Fenske wonders every day if he could have made a difference in that loss. Instead, the forced ineligibility from the Transfer Eligibility Rule negatively impacted his ability to play professional football, his ability to earn NIL money, and his mental health.

65.     The NCAA's willingness to apply the Transfer Eligibility Rule despite the negative mental health consequences suffered by college athletes because of the Rule flies in the face of the lip-service that the NCAA has proudly given to its commitment to understanding and addressing college athletes' mental health concerns. *See, e.g.*, Michelle Brutlag Hosick, *NCAA President Charlie Baker Lays Out Agenda for Growth, Transformation with Focus on Serving Student-Athletes*, NCAA (Aug. 2, 2023, 11:00 AM), https://www.ncaa.org/news/2023/8/2/media-center-ncaa-lays-out-agenda-for-growth-transformation-with-focus-on-serving-student-athletes.aspx (where the NCAA's national office, just months ago, reaffirmed its guidance to "[p]rovide a world-class athletics and academic experience for [college athletes] that fosters lifelong well-being."); *see also* Charlie Henry, *Social Series Highlights Importance of Mental Health Resources and Education*, NCAA (May 5, 2022, 11:26 AM),  https://www.ncaa.org/news /2022/5/25/media-center-social-series-highlights-importance-of-mental-health-resources-and-education.aspx#:~:text=The%20NCAA%20has%20developed%20several,mental%20health%20 needs%20of%20their ("NCAA has developed several educational resources, including 'Mental

Health Best Practices: Understanding and Supporting Student-Athlete Mental Wellness,' [a] resource…designed with input from a diverse group of member and industry voices to help schools support and address the mental health needs of their [college athletes]."); *see also* Sports Science Institute, *Mental Health*, NCAA, https://www.ncaa.org/sports/2021/2/10/sport-science-institute-mental-health.aspx (last visited Nov. 10, 2023) (where the NCAA discusses educational resources, best practices for campuses, data and research, and summits and task forces, which all seek to address the importance of safeguarding college athletes' mental health and where the NCAA states that "[m]ental health [is a part of athlete health and] exists on a continuum, with resilience and thriving on one end of the spectrum and mental health disorders that disrupt a [college athlete's] functioning and performance at the other.").

66.     The Transfer Eligibility Rule harms college athletes at every point in the transfer process and for the entire academic year where the Rule forces affected college athletes to watch from the sidelines and forego the benefits of competing in NCAA athletic events. The Rule's chilling effect on transfer decisions can discourage college athletes from seeking the environment that is most beneficial to their well-being, and the Rule can limit the choices a college athlete has when transferring by competitively disadvantaging them when seeking a new school. Beyond the transfer process itself, the Rule prevents affected college athletes from realizing the significant benefits that come from competing in NCAA athletic events that are available only through competing on gameday. Thus, the Transfer Eligibility Rule harms college athletes in the relevant markets.

### *The Transfer Eligibility Rule's Effects on Consumers*

67.     The Transfer Eligibility Rule has downstream effects for consumers who attend NCAA athletic events in-person and for consumers who watch the events on television or listen

on the radio. When the Transfer Eligibility Rule prevents college athletes from competing at their new institution after transferring, the Rule can decrease fan interest in a team's season by making popular players ineligible for competition and decreasing a team's competitiveness on gameday.

68.     Furthermore, the Transfer Eligibility Rule is a barrier to increased parity in college athletics that would create a better product for consumers. By discouraging transfers through the academic year in residence requirement, the Transfer Eligibility Rule benefits larger and historically successful sports programs by allowing them to retain talented players on their depth charts who may otherwise wish to transfer and may be better served by transferring to another institution. Similarly, programs outside of the traditional upper echelon of college athletics would benefit from an environment without the Transfer Eligibility Rule, as it would allow them to enroll such transferring college athletes and have them compete in their athletics program. This, in turn, would lead to more parity within college athletics. A more level playing field of talent among Division I institutions creates a more compelling product for consumers of college athletics, and the Transfer Eligibility Rule stifles this increase in parity. The Transfer Eligibility Rule harms consumers of college athletics by making teams less competitive while affected college athletes are ineligible for an entire academic year and by preventing increased parity in college athletics that would create a more compelling product for consumers.

### *The Rule of Restitution and Its Impact on College Athletes and NCAA Division I Institutions*

69.     The Rule of Restitution, NCAA Bylaw 12.11.4.2, in a nutshell, provides that, if a plaintiff obtains an injunction against the unlawful conduct of the NCAA, and a college athlete and his or her member institution conduct themselves in conformity with that injunction, the NCAA may impose draconian punishments on both the athlete and the institution if the

injunction is "vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified." Exhibit A at 66–67.

70.     The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. For example, a college athlete could obtain a preliminary injunction to play during his final year of eligibility and, once the season is over, not wish to incur the cost and effort of continuing to litigate and instead wish to voluntarily dismiss. Alternatively, a court could determine that the athlete's eligibility had ended and the case was thereby mooted, resulting in dismissal. In both instances, the NCAA could impose harsh penalties in retaliation against the college athlete and the athlete's school even though the only court to consider the issue had ruled in the college athlete's favor.

71.     Knowing this, many universities will not permit college athletes who challenge NCAA rules in court to compete, even if a court issues a temporary restraining order or preliminary injunction finding that those rules are likely illegal. This, in turn, deters college athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

72.     The Rule of Restitution's purpose and effect is to deter challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual college athletes and member universities of the practical ability to rely on court orders in their favor. Thus, the Rule of Restitution is itself a means of preventing defection from the anticompetitive agreement by member schools and of weaponizing the delay inherent in the litigation process to deter college athletes from mounting challenges to the antitrust merits of the NCAA's rules.

73.     For any relief granted by this Court during the pendency of this case or on the merits to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution against college athletes and NCAA member institutions in retaliation for compliance with orders from this Court. Absent relief enjoining the Rule of Restitution, schools still may not allow college athletes ineligible under the Transfer Eligibility Rule to play for fear of future retaliation by the NCAA.

74.     Because of the Rule of Restitution, college athletes run the risk of severe personal punishment and the risk of subjecting their schools or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. The rule amounts to the NCAA effectively deciding for itself the rules of interim relief rather than the courts. This deprives college athletes of the practical ability to rely on a court's temporary or preliminary injunctive relief in their favor. The Rule of Restitution is also a means of enforcing cartel-style discipline among the NCAA's member institutions, preventing defection, and manipulating rules of mootness to discourage challenges to the rules. For injunctive relief from this court to be effective, that relief must enjoin Defendant from punishing college athletes and member institutions under the Rule of Restitution simply for doing what a court of law prescribed for them to do.

## LACK OF PROCOMPETITIVE JUSTIFICATIONS

75.     With the anticompetitive effects of the Transfer Eligibility Rule in the relevant markets described above, the burden must shift to Defendant under the rule of reason to provide procompetitive justifications for the Transfer Eligibility Rule. Despite what the NCAA could offer as justifications for the Rule, these justifications are pretextual and cannot outweigh the anticompetitive effects of the rule. Furthermore, the purported goals for the Transfer Eligibility

Rule can be accomplished through less restrictive alternatives that are already present in the NCAA's bylaws.

### *The Transfer Eligibility Rule's Purported Justifications are Pretextual*

76.     The NCAA claims that bylaws such as the Transfer Eligibility Rule help college athletes maintain their academic progress and avoid falling behind due to the logistics and change that come with transferring schools. In addition, one purported justification for rules like the Transfer Eligibility Rule is that it promotes the NCAA's goal of preserving athletic amateurism, allowing it to widen consumer choice through a unique product of amateur sports distinct from professional sports. However, both the text and the actual impact of the Transfer Eligibility Rule make these justifications pretextual.

77.     Despite the NCAA's goal of promoting college athletes' academic well-being, the Transfer Eligibility Rule does not accomplish this goal and does not give college athletes additional time in their schedules to acclimate to a new campus environment. The Rule prevents college athletes from competing in NCAA athletic events for one academic year following a transfer. However, the Rule does not prevent those college athletes from participating in practices or other team activities during this year of ineligibility. Sitting out an entire season of practices and team workouts is not an option for college athletes who want to maintain their standing on a team. Thus, even under the restrictions of the Transfer Eligibility Rule, college athletes have no additional time in their schedules for increased attention to academics compared to their teammates who are eligible for competition except for a few hours on gameday when affected college athletes are forced to watch from the sidelines. Moreover, the NCAA does not limit the eligibility of freshman college athletes, whose transition from high school to college is

far more arduous than that of a college athlete transferring between schools. Therefore, the

Transfer Eligibility Rule does not promote the academic well-being of college athletes.

78.     Furthermore, the Transfer Eligibility Rule does not support the goal of

maintaining athletic amateurism in the NCAA. The NCAA has claimed in previous cases that the

amateur nature of college athletics makes it uniquely appealing to consumers, as it distinguishes

NCAA athletics from professional sports leagues. However, as a matter of law, supposed

benefits in the market for watching college athletics cannot counterbalance harms the distinct,

sport-specific markets for college athlete labor. *See Deslandes v. McDonald's United States,*

*LLC*, 81 F.4th 699, 703 (7th Cir. 2023). Even if this cross-market balancing was appropriate, the

Transfer Eligibility Rule has nothing to do with college athletes maintaining amateur status.

79.     NCAA Bylaw 12.1.2 requires that Division I college athletes maintain amateur

status to be eligible for NCAA competition. Exhibit A at 37. This bylaw states:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
> (a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;
> (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
> (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;
> (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;
> (e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;
> (f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or
> (g) Enters into an agreement with an agent.

*Id.*

80.     By the definition the NCAA uses in its own bylaws, the Transfer Eligibility Rule does not affect anything related to a college athlete's amateur status. Allowing college athletes to practice all season with their teams but preventing them from competing on gameday does nothing to a college athlete's amateur status. The absence of the Transfer Eligibility Rule would do nothing to affect the amateur status of transferring college athletes. The Transfer Eligibility Rule does not serve the goal of preserving the NCAA's amateurism model nor does it help preserve the amateur status of college athletes, and the justifications for the Transfer Eligibility Rule are pretextual.

### *The Purported Goals of the Transfer Eligibility Rule Are Accomplished Through Less Restrictive Bylaws Already in Place*

81.     While the goals of the Transfer Eligibility Rule may be promoting the academic well-being of college athletes and preserving athletic amateurism within the NCAA, less restrictive alternatives already exist within the NCAA's regulatory structure that ensure that college athletes maintain progress towards college degrees and prevent college sports from becoming a free agent market like professional sports leagues.

82.     NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. NCAA Bylaw 14.4.1 requires college athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition at their college or university. Exhibit A at 150–51. In addition, NCAA Bylaw 20.2.4.13 requires member institutions to publish their progress-toward-degree requirements for college athletes, thus making these requirements available to college athletes at each institution. *Id.* at 367. Other NCAA Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. *Id.* at 151, 154.

83.     Further, NCAA Bylaws already prohibit in-season transfers within the same sport.

Specifically, NCAA Bylaw 14.5.5.3 states,

> A transfer student from a four-year institution who has received a waiver of or qualifies for an exception to the transfer residence requirement (per Bylaw 14.5.5.2) shall not be eligible for competition in which the [college athlete's' performance could be used for NCAA championship qualification or consideration if the [college athlete] participated in competition at the previous four-year institution in the same sport in which the [college athlete's] performance could have been used for NCAA championship qualification or consideration.

*Id.* at 168.

84.     These NCAA Bylaws setting minimum academic requirements and preventing in-season transfers already exist as less restrictive alternatives to achieving the goals of the Transfer Eligibility Rule. The academic eligibility requirements already in effect serve the goal of preventing college athletes from falling behind academically while still being eligible to compete in athletic events. If a college athlete fails to make adequate progress toward a degree or otherwise fails to meet minimum NCAA requirements, the student will be ineligible to participate in competition. The requirement that the member institutions provide college athletes with the progress-toward-degree requirements at each institution allows college athletes to adequately plan and know what will be required academically to maintain athletic eligibility.

85.     Furthermore, preventing in-season transfers with immediate eligibility serves the goal of preserving athletic amateurism among NCAA college athletes. This rule prevents the kind of free agent movement among teams seen in professional sports leagues by preventing college athletes from leaving mid-season either for participation on a higher-achieving team or in search of more playing time. These goals are accomplished without the unwarranted restrictions of the Transfer Eligibility Rule.

86.     With the goals of the Transfer Eligibility Rule met by less restrictive alternatives already present in the NCAA's Bylaws, the NCAA cannot justify imposing the restrictions of the Transfer Eligibility Rule on college athletes. Any purported benefits of the Transfer Eligibility Rule are far outweighed by the harm the rule inflicts on college athletes and consumers of college athletics. With less restrictive alternatives already in place, there is no justification for the NCAA to restrict the choices of college athletes in the relevant markets by enforcing the Transfer Eligibility Rule.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT

87.     Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully set forth herein.

88.     Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Transfer Eligibility Rule. Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes to transfer to other Division I schools without loss of athletic eligibility. The restraint imposed by the Transfer Eligibility Rule cannot withstand analysis under the rule of reason.

89.     The markets for athletic services in men's and women's Division I basketball and football bowl subdivision ("FBS") football and for athletics services in all other men's and women's Division I sports are relevant antitrust markets. The transactions between NCAA member institutions and college athletes in these markets are commercial in nature and fall under the purview of the Sherman Act.

90.     This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as transferring college athletes potentially face a one-year waiting period before obtaining full eligibility to compete in NCAA athletic events at their new member institution. The threat of this one-year waiting period discourages transfers, disadvantages college athletes subject to this waiting period, and prevents college athletes from realizing the benefits of competing in NCAA athletic events for an entire academic year.

91.     Division I college athletes have been deprived of the benefits of free and open competition because of the Transfer Eligibility Rule. Furthermore, college athletes forced to wait a year prior to eligibility after transferring are deprived of the benefits that come from competition in NCAA Division I athletic events, harming these college athletes' current and future earning potentials.

92.     As a direct result of Defendant's conduct, Division I college athletes and consumers of college athletics have suffered and continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the Transfer Eligibility Rule.

93.     The Transfer Eligibility Rule yields few, if any, benefits to competition in Division I collegiate athletics to the NCAA's member institutions, to college athletes, or to consumers of NCAA athletics contests. Any such benefits are far outweighed by the harm to competition and to the college athletes who are subject to the Transfer Eligibility Rule. Furthermore, the NCAA bylaws already contain less restrictive alternatives that accomplish the NCAA's goals for the Transfer Eligibility Rule.

94.     Defendant's conduct is ongoing and will continue to impose injury on college athletes and consumers of college athletics unless injunctive relief is granted. This ongoing harm from the Transfer Eligibility Rule affects residents and the economies of the Plaintiff States by unreasonably restraining trade in labor markets for college athletics within the Plaintiff States.

95.     Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

96.     Adjudge and decree that Defendant's enforcement of NCAA Bylaw 14.5.5.1 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

97.     Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaw 14.5.5.1 and from enforcing NCAA Bylaw 12.11.4.2 to punish college athletes and member institutions for actions taken in compliance with any orders from this Court;

98.     Award to each Plaintiff its costs, including reasonable attorneys' fees; and

99.     Order any other relief that this Court deems just and proper.

Dated: December 7, 2023

DAVE YOST
OHIO ATTORNEY GENERAL

Erik Clark
Deputy Attorney General for Major Litigation

Jennifer L. Pratt
Director of Major Litigation

Beth A. Finnerty
Section Chief, Antitrust Section


*s/ Steven Oldham*
Steven Oldham (*pro hac vice* forthcoming)
Assistant Attorney General, Major Litigation

*s/ Edward J. Olszewski*
Edward J. Olszewski (*pro hac vice* forthcoming)
Assistant Section Chief, Antitrust Section

*s/ Derek M. Whiddon*
Derek M. Whiddon (*pro hac vice* forthcoming)
Assistant Attorney General, Antitrust Section

Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Steven.Oldham@OhioAGO.gov
         Edward.Olszewski@OhioAGO.gov
         Derek.Whiddon@OhioAGO.gov

*Attorneys for Plaintiff State of Ohio*

**FOR PLAINTIFF STATE OF COLORADO**

PHILIP J. WEISER
ATTORNEY GENERAL


  */s/ Bryn Williams*
BRYN WILLIAMS
First Assistant Attorney General
ELIZABETH W. HEREFORD
Assistant Attorney General

Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email:  Bryn.Williams@coag.gov
        Elizabeth.Hereford@coag.gov

*Attorneys for Plaintiff State of Colorado*

**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL, ATTORNEY GENERAL

*/s/ Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER, Chief, Antitrust Bureau

Elizabeth L. Maxeiner, Chief, Antitrust Bureau
Brian M. Yost, Assistant Attorney General, Antitrust Bureau


Office of the Illinois Attorney General
100 W. Randolph St., Fl. 11
Chicago, IL 60601
Phone: (773) 790-7935
Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov

*Attorneys for the Plaintiff State of Illinois*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
ATTORNEY GENERAL

Christopher D'Angelo
Chief Deputy Attorney General,
Economic Justice Division

*s/ Elinor R. Hoffmann*
Elinor R. Hoffmann (*pro hac vice* forthcoming)
Chief, Antitrust Bureau

*s/ Amy McFarlane*
Amy McFarlane (*pro hac vice* forthcoming)
Deputy Chief, Antitrust Bureau

*s/ Bryan Bloom*
Bryan Bloom (*pro hac vice* forthcoming)
Senior Enforcement Counsel, Antitrust Bureau

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269 (Hoffmann)
Email: Elinor.Hoffmann@ag.ny.gov
        Amy.McFarlane@ag.ny.gov
        Bryan.Bloom@ag.ny.gov

*Attorneys for Plaintiff State of New York*

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
ATTORNEY GENERAL OF NORTH CAROLINA

*/s/ Jonathan R. Marx*
JASMINE MCGHEE*
Senior Deputy Attorney General
JONATHAN R. MARX*
Special Deputy Attorney General
KUNAL CHOKSI*
Special Deputy Attorney General


North Carolina Department of Justice
114 W. Edenton St
Raleigh, NC 27603
Telephone: (919) 716-8611
Email: jmarx@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**pro hac vice* motions pending

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
ATTORNEY GENERAL AND REPORTER

*/s/ J. David McDowell*
J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS
Senior Assistant Attorney General
TYLER T. CORCORAN
Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Phone: (615) 741-8722
Email: David.McDowell@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

**FOR PLAINTIFF STATE OF WEST VIRGINIA
AND AS LOCAL COUNSEL FOR THE PLAINTIFF
STATES OF OHIO, COLORADO, ILLINOIS,
NEW YORK, NORTH CAROLINA, AND TENNESSEE**

STATE OF WEST VIRGINIA ex rel.
PATRICK MORRISEY, ATTORNEY GENERAL

*/s/ Michael R. Williams*
Michael R. Williams, Principal Deputy Solicitor General
Douglas L. Davis, Sr. Assistant Attorney General
Matthew M. Morrison, Assistant Attorney General

Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Ph. (304) 558-8986
Fax. (304) 558-0184
Michael.R.Williams@wvago.gov
Douglas.L.Davis@wvago.gov
Matt.M.Morrison@wvago.gov

*Counsel for Plaintiff State of West Virginia and
Local Counsel for Plaintiff States of Ohio, Colorado,
Illinois, New York, North Carolina, and Tennessee*