**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

|  |  |  |
|---|---|---|
| **STATE OF OHIO,** | : | CASE NO: 1:23-cv-00100 |
| 30 E. Broad St., 26th Floor | : | JUDGE  Kleeh |
| Columbus, OH 43215 | : | |
|  | : | |
| **STATE OF COLORADO,** | : | |
| 1300 Broadway, 7th Floor | : | |
| Denver, CO 80203 | : | |
|  | : | |
| **STATE OF ILLINOIS,** | : | **MEMORANDUM IN SUPPORT OF** |
| 100 West Randolph Street | : | **PLAINTIFFS' MOTION FOR A** |
| Chicago, IL 60601 | : | **TEMPORARY RESTRAINING ORDER** |
|  | : | **AND PRELIMINARY INJUNCTION** |
| **STATE OF NEW YORK,** | : | |
| 28 Liberty Street | : | |
| New York, NY 10005 | : | |
|  | : | |
| **STATE OF NORTH CAROLINA,** | : | |
| 114 W. Edenton Street | : | |
| Raleigh, NC 27603 | : | |
|  | : | |
| **STATE OF TENNESSEE,** | : | |
| P.O. Box 20207 | : | |
| Nashville, TN 37202 | : | |
|  | : | |
| **STATE OF WEST VIRGINIA,** | : | |
| P.O. Box 1789 | : | |
| Charleston, WV 25326 | : | |
|  | : | |
| **Plaintiffs,** | : | |
|  | : | |
| **v.** | : | |
|  | : | |
| **NATIONAL COLLEGIATE** | : | |
| **ATHLETIC ASSOCIATION** | : | |
| 700 W. Washington Street | : | |
| P.O. Box 6222 | : | |
| Indianapolis, IN 46206-6222 | : | |
|  | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

## I.  INTRODUCTION

College sports encourage competition among college athletes and NCAA member institutions both on and off the field. Competing in NCAA Division I athletics provides college athletes with unique opportunities and benefits, many of which the NCAA proudly trumpets in its promotional materials. However, NCAA Bylaw 14.5.5.1 ("Transfer Eligibility Rule") neither promotes competition nor benefits college athletes. This arbitrary rule stifles the competition in the labor markets within NCAA Division I athletics, harming college athletes and degrading the quality of Division I college sports consumed by the public. These harms are contrary to Defendant's stated mission of promoting the well-being of college athletes and are the very ills federal antitrust law seeks to remedy. The college athletes who are harmed by this illegal restraint have a small window of time to compete in Division I athletics. Because college athletes cannot relive their short college careers, the harm inflicted by the Transfer Eligibility Rule is irreparable and ongoing, and temporary and preliminary injunctive relief is necessary.

## II.  BACKGROUND

The NCAA and its member institutions, which include over 1,000 public and private colleges and universities across the United States, are organized under a constitution, and member institutions are grouped into three divisions. NCAA, *Division I 2023-24 Manual*, 3 (accessed Nov. 2, 2023), available at: https://web3.ncaa.org/lsdbi/reports/getReport/90008, included in this filing as Exhibit A. Each of the NCAA's three divisions has the authority to determine its own governing structure and membership. *Id.* at 5. The NCAA is overseen by a Board of Governors which appoints the President to administer the Association and "implement directions of the Board of Governors and divisional leadership bodies." *Id.* at 4. Each member

1

institution is required to "hold itself accountable to support and comply with the rules and principles approved by the membership." *Id.* at 9.

Each NCAA division maintains its own legislative process for adopting bylaws, with some bylaws applying to only one division and others applying across divisions. *Id.* at 14. Proposed bylaw changes that move through the divisional legislative process within an "area of autonomy" as identified by the bylaws are adopted by certain conferences and their member institutions. *Id.* at 15. Federated legislation—changes that are applicable only to the adopting division—can be made by the Division I Council. *Id.* at 17. The Division I Council is comprised of representatives from member institutions and conferences. *Id.* at 396–397. Member institutions can propose amendments to the bylaws for the Division I Council's review and can comment on proposed amendments under consideration. *Id.* at 17–18.

NCAA Bylaw 13.1.1.3.1 provides that for undergraduate college athletes that wish to transfer to a new member institution, the college athlete must provide notice to the current institution during a specified period for the college athlete's given sport. *Id.* at 75–76. After notification of intent to transfer, the current institution must "enter the [college athlete's] information into the national transfer database," a process known as the NCAA Transfer Portal. *Id.* at 75. According to a recent NCAA statement, 21,685 college athletes had entered the transfer portal in 2023 as of September 12. *DI Board Statement Regarding Transfer Waivers*, NCAA (Sept. 12, 2023), https://www.ncaa.org/news/2023/9/12/media-center-di-board-statement-regarding-transfer-waivers.aspx.

NCAA Bylaw 14.5.5.1, herein referred to as the Transfer Eligibility Rule, states, "A transfer student from a four-year institution shall not be eligible for intercollegiate competition at a member institution until the student has fulfilled a residence requirement of one full academic

year (two full semesters or three full quarters) at the certifying institution." Exhibit A at 165. This rule does not prevent a college athlete from practicing or participating in other team activities during this one-year waiting period, only from competing on gameday. *Id.* One exception to this rule found in NCAA Bylaw 14.5.5.2.10 exempts college athletes transferring for the first time from the Transfer Eligibility Rule. *Id.* at 167. NCAA Bylaw 12.8.1 provides that college athletes have five calendar years to complete their four seasons of eligibility in any one sport. *Id.* at 55.

NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . .

*Id.* at 66–67. Potential punishments under the Rule of Restitution include vacating wins, post-season bans, return of television revenue, and financial penalties, among others. *Id.*

## III.    LEGAL STANDARD

To succeed on a motion for initial injunctive relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Courts evaluating requests for initial injunctive relief "must separately consider each *Winter* factor." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

## IV.    ARGUMENT

Balancing the four factors outlined above, Plaintiffs can meet the requirements for a temporary restraining order and a preliminary injunction against Defendant's enforcement of the Transfer Eligibility Rule.

### A. Plaintiffs have a likelihood of success on the merits of their Sherman Act Section 1 claim.

Section 1 of the Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. When analyzing a claim under Section 1 of the Sherman Act, "a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The first step is that "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Id.* If a plaintiff meets this burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If a defendant provides this rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

### i.    Labor markets within NCAA Division I athletics are relevant antitrust markets.

In defining a relevant market, "[a] relevant product market 'is composed of products that have reasonable interchangeability for the purposes for which they are produced.'" *Berlyn Inc. v. Gazette Newspapers, Inc.*, No. 02-2152, 2003 U.S. App. LEXIS 16814, *13 (4th Cir. Aug. 18, 2003) (quoting *United States v. E.I. duPont de Nemours and Co.*, 351 U.S. 377, 404 (1956)). When analyzing a restriction in the context of "supplier markets such as the employment market . . . the relevant market is one where employment positions are reasonably interchangeable with

those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005).

The Supreme Court in *NCAA v. Alston* explained that "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for [college athlete] services, such that its restraints can (and in fact do) harm competition." *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021). Furthermore, there are no alternatives to the benefits of participation in NCAA Division I athletics for college athletes, and in *Alston*, the NCAA did not contest "that [college athletes] have nowhere else to sell their labor." *Id.*

Within NCAA Division I athletics, the Transfer Eligibility Rule affects two broad categories of labor markets: (1) athletic services in men's and women's Division I basketball and football bowl subdivision ("FBS") football, wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market. Within these markets, college athletes compete for roster spots on athletic teams at NCAA Division I institutions, and those institutions compete against each other to recruit the best college athletes to compete on their athletic teams.

The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

There are no alternatives to the benefits college athletes receive from participating in NCAA Division I athletics. The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. The NCAA itself frequently reiterates the unique nature of its

5

amateurism model, arguing in *Alston* that this model "widens consumer choice by providing a unique product—amateur college sports as distinct from professional sports." *Alston* at 2152.

Within these relevant markets, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. Furthermore, these transactions pave the way for college athletes to profit from name, image, and likeness ("NIL") agreements. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.

### ii.  The Transfer Eligibility Rule harms college athletes in the relevant markets.

For the interscholastic athletic competitions overseen by the NCAA to exist, there certainly must be some level of coordination among member institutions that simultaneously compete against one another. Indeed, "some degree of coordination between competitors within sports leagues can be procompetitive," for without agreed upon rules of a given sport, "the very competitions that consumers value would not be possible." *Alston* at 2156. However, "[t]hat *some* restraints are necessary to create or maintain a league sport does not mean *all* 'aspects of elaborate interleague cooperation are.'" *Id.* (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010)). Like the compensation-related restrictions at issue in *Alston*, the Transfer Eligibility Rule "fall[s] on the far side of this line." *Alston* at 2157.

The Transfer Eligibility Rule amounts to no more than a no-poach, market allocation agreement among NCAA member institutions for the labor of Division I college athletes. Rather

than promoting competition or benefits to college athletes, the Transfer Eligibility Rule hamstrings them by limiting the choices they have within the relevant market to find the Division I institution that provides the best environment for their academic, athletic, mental, and economic well-being. These same restrictions are not placed on students who do not participate in college athletics, nor are they placed on coaches who leave one NCAA member institution for another. The Transfer Eligibility Rule harms college athletes in three main areas of the relevant markets: (1) when college athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend, and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution.

First, the Transfer Eligibility Rule harms college athletes by penalizing transfers with an entire academic year of ineligibility. When considering whether there may be a more beneficial environment at a different NCAA member institution, college athletes must weigh the possibility of being forced to sit on the sidelines of their sport for the next year with the potential for a more beneficial situation away from their current school. College athletes cannot apply for a waiver of the Transfer Eligibility Rule until enrolled at a new NCAA member institution, and the rule causes friction in the relevant labor markets by imposing the risk of ineligibility if a transferring college athlete is denied a waiver in what has become and inconsistently applied waiver process. This risk has a chilling effect on college athletes' transfer decisions and discourages them from exercising their freedom of economic choice to find the best situation for their academic, mental, and athletic well-being.

Second, the Transfer Eligibility Rule restricts the options of affected college athletes by limiting their choices of new institutions after making the decision to transfer. After making the decision to transfer, college athletes must enroll at a new institution prior to applying for a

waiver of the Transfer Eligibility Rule. Because first-time transferring college athletes are excepted from the Transfer Eligibility Rule, college athletes who are not excepted from the Transfer Eligibility Rule face a competitive disadvantage in the relevant markets. NCAA member institutions compete for the best college athletes for their athletic teams, and when facing the risk that a transferring college athlete may be ineligible for an entire academic year, member institutions may be less likely to offer a scholarship position to college athletes who are subject to the Transfer Eligibility Rule. The Transfer Eligibility Rule unjustifiably disadvantages affected college athletes and limits their choices of new member institutions when transferring.

Third, the Transfer Eligibility Rule prevents college athletes from realizing the benefits of competing in NCAA Division I athletics for an entire academic year after transferring. The NCAA frequently touts the benefits of competing in college athletics for college athletes, especially for college athletes who will not move on to professional athletics. *See, e.g.*, *The Value of College Sports*, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Nov. 10, 2023) (where the NCAA expressly notes that the value of college sports to its college athletes includes unparalleled exposure and experiences through "the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports."). Furthermore, for college athletes who are looking to compete professionally after college, NCAA Division I athletic competition provides an unparalleled opportunity to showcase their skills and talents, affecting their current and future earning potential both for athletic competition and for name, image, and likeness compensation.

8

The Transfer Eligibility Rule denies these benefits to transferring college athletes for an entire academic year. The lost opportunity that comes with sitting out an entire athletics season is significant, as the lost time and economic opportunity cannot be easily remedied. For college athletes in the market to provide athletic services in men's and women's Division I basketball and FBS football, the impact of missed games is even more pronounced in its effect on the athletes' future earning potential. Each game missed is a lost opportunity to showcase a college athlete's elite skills in front of national audiences and professional scouts. An entire year of missed competition causes immeasurable and irreparable harm to college athletes. Through a chilling effect on the decision to transfer, limiting the options of new institutions, and denying the opportunity to compete in Division I NCAA athletic events for an entire academic year, the Transfer Eligibility Rule harms college athletes in the relevant markets.

### iii.   The Transfer Eligibility Rule harms consumers of college athletics.

The Transfer Eligibility Rule causes negative downstream effects on consumers of college athletics. When college athletes are prevented from competing simply because of a decision to seek a more beneficial environment, the value of the product that the NCAA provides to consumers is diminished. Teams may be less competitive without skilled transfer players, fans lose the opportunity to see those college athletes compete for their favorite teams on gameday, and the product of NCAA athletics is less compelling for consumers.

Furthermore, the Transfer Eligibility Rule is a barrier to increased parity in college athletics that would create a better product for consumers. By discouraging transfers through the academic year in residence requirement, the Transfer Eligibility Rule benefits larger and historically successful sports programs by allowing them to retain talented players on their depth charts who may otherwise wish to transfer and may be better served by transferring to another

institution. Similarly, programs outside of the traditional upper echelon of college athletics would benefit from an environment without the Transfer Eligibility Rule, as it would allow them to enroll such transferring college athletes and have them compete in their athletics program. This, in turn, would lead to more parity within college athletics. A more level playing field of talent among Division I institutions creates a more compelling product for consumers of college athletics, and the Transfer Eligibility Rule stifles this increase in parity. The Transfer Eligibility Rule harms consumers of college athletics by making teams less competitive while affected college athletes are ineligible for an entire academic year and by preventing increased parity in college athletics that would create a more compelling product for consumers.

> iv. **Procompetitive justifications for the Transfer Eligibility Rule are pretextual, and less restrictive alternatives accomplish the NCAA's goals for the Rule.**

Based on its guidance regarding the academic year in residence requirement and its arguments in previous cases, the NCAA is likely to proffer two potential justifications for the Transfer Eligibility Rule. These involve both college athletes as individuals and the NCAA model as a whole. First, the NCAA may argue that one potential justification for the rule is that it promotes the academic well-being of college athletes. In guidance to college athletes on the transfer process, the NCAA has stated that "[r]equiring student-athletes to sit out of competition for a year after transferring encourages them to make decisions motivated by academics as well as athletics. Most student-athletes who are not eligible to compete immediately benefit from a year to adjust to their new school and focus on their classes." NCAA Eligibility Center, *2018-19 Guide for Two-Year Transfers*, 14 (Sept. 2018), https://flc.losrios.edu/flc/main/doc/support-services/Counseling/NCAA_TransferGuide.pdf.

A second potential justification the NCAA may raise, and one it raised in response to the bylaw challenges in *Alston*, is that restrictions like the Transfer Eligibility Rule preserve the

amateurism model of the NCAA. *Alston* at 2152. Restrictions like the transfer eligibility rule, the NCAA may argue, help it "widen[] consumer choice by providing a unique product—amateur college sports as distinct from professional sports." *Id.* However, these justifications are pretextual and, even if valid, could be accomplished through less restrictive alternatives.

   While the Transfer Eligibility Rule may be intended to help college athletes maintain progress towards a college degree, the rule itself does nothing to promote this goal. The Transfer Eligibility Rule only prevents college athletes from competing with their team in NCAA athletic events. The Rule does not prohibit participation in practices or other organized team activities, nor does it prescribe a certain number of hours that college athletes must spend on their studies during the academic year of residence when they are ineligible for competition. Sitting out an entire year of practices, workouts, and other team events is not an option for college athletes who want to maintain their standing on an NCAA Division I athletic team. Thus, college athletes subject to the Transfer Eligibility Rule devote the same amount of their time to athletics as their teammates save for a few hours of actual competition on gameday. *See* Decl. of Noah Fenske, ¶ 9; Decl. of Jarrett Hensley, ¶ 11. Despite the NCAA's purported concerns on the challenges of transition to a new institution, no bylaw prevents freshman college athletes from competing despite the challenges experienced by high school athletes matriculating to college academics and athletics. The Transfer Eligibility Rule does nothing to promote the academic well-being of college athletes and only serves to prevent college athletes from realizing the benefits of competing in NCAA Division I athletics.

   Furthermore, the Transfer Eligibility Rule does not aid the NCAA in maintaining consumer interest by promoting its unique product of amateur sports as distinct from professional sports. As a matter of law, supposed benefits in the market for consuming college

athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." *Deslandes v. McDonald's United States, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). This approach "is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise." *Id.* Accordingly, consumers' supposed desire for college athletes to be shackled to their respective teams cannot balance against the harm caused to those students.

However, even if this cross-market balancing was legally cognizable, the Transfer Eligibility Rule has nothing to do with college athletes maintaining amateur status. NCAA Bylaw 12.1.2 requires that Division I college athletes maintain amateur status to be eligible for NCAA competition. Exhibit A at 37. This bylaw states:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
> (a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;
> (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
> (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any
> consideration received, except as permitted in Bylaw 12.2.5.1;
> (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a
> professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;
> (e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;
> (f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or
> (g) Enters into an agreement with an agent.

*Id.* Nothing in the Transfer Eligibility Rule affects the amateur status of college athletes as defined by the NCAA. Preventing college athletes from competing in NCAA athletic events

solely because they made a decision in their own best interest and transferred schools has no relationship with the amateur status of those athletes. The argument that the Transfer Eligibility Rule supports the amateurism model of the NCAA is pretextual and does not justify the anticompetitive restrictions that the Rule places on college athletes.

In addition, both the academic and amateurism goals of the NCAA are accomplished through less restrictive alternatives already in place within the NCAA bylaws. NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. NCAA Bylaw 14.4.1 requires college athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition at their college or university. Exhibit A at 150–51. In addition, NCAA Bylaw 20.2.4.13 requires member institutions to publish their progress-toward-degree requirements for college athletes, thus making these requirements available to college athletes at each institution. *Id.* at 367. Other NCAA Bylaws require minimum credit hour and grade point averages for college athletes to be eligible for competition. *Id.* at 151, 154. Furthermore, NCAA Bylaws already prohibit in-season transfers within the same sport; specifically, NCAA Bylaw 14.5.5.3 prevents college athletes from transferring mid-season and competing in the same sport they competed in at the previous institution within the same season. *Id.* at 168.

These bylaws on academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the Transfer Eligibility Rule. In the absence of the Rule, college athletes who fail to make requisite progress towards a degree or fail to maintain the required GPA would still be ineligible for competition. Furthermore, bylaws preventing in-season transfers keep NCAA athletics from becoming a free agent market like those in professional sports, as a college athlete unhappy with

how a current season is going cannot demand a transfer only to compete for another member institution in the same athletics season. Thus, procompetitive justifications for the Transfer Eligibility Rule can be accomplished through less restrictive alternatives.

Within the relevant markets, the Transfer Eligibility Rule harms college athletes by discouraging them from freely seeking the most beneficial institution for their well-being, limiting their options after the decision to transfer is made, and denying them the benefits of NCAA competition for entire academic year. The Transfer Eligibility Rule harms consumers by decreasing the competitiveness of teams whose transfer players are ineligible under the rule and by stifling increased parity in college athletics, both of which diminish the product the NCAA provides to consumers of college athletics. The goals of the Transfer Eligibility Rule can be accomplished through less restrictive alternatives that already exist within the NCAA bylaws. A rule of reason analysis of the Transfer Eligibility Rule reveals that it is the exact kind of unreasonable restraint of trade within labor markets that the antitrust laws prohibit. Thus, Plaintiffs have a strong likelihood of success on the merits of their Sherman Act Section 1 claim.

## B. Plaintiffs, through harm to college athletes in their respective states, are suffering and will continue to suffer irreparable harm without injunctive relief.

NCAA Division I college athletes who believe it is in their best interest to transfer to another academic institution to fulfil their academic and athletic goals or for their mental health are unlawfully restrained from doing so because of the Transfer Eligibility Rule. This restriction affects various categories of college athletes. Such examples include, but are not limited to (1) those who have transferred more than once and decided not to enter the transfer portal, because losing the ability to have immediate eligibility was too great a risk to take, (2) those who believed that they may qualify for a waiver of the requirement to sit out a year, but they believed a waiver made not be granted, so they decided against transferring, and (3) those who transferred

14

and sought a waiver, but their waiver was denied by the NCAA. Thus, while first-time college athlete transferees can compete—and there are no restrictions at all for non-athlete student from transferring or for coaches to transfer and immediately coach at a new school—the NCAA prevents immediate eligibility for multiple-time transferees through the Transfer Eligibility Rule.

Recognizing that college athletes, like their college peers, encounter circumstances that may make a transfer in a college athlete's best interest, the NCAA in recent years expanded the exception to the Transfer Eligibility Rule to allow college athletes seeking a first-time transfer to switch schools without penalty and to guarantee financial aid through graduation to transferring college athletes. Meghan Durham, *Division I Board Adopts Changes to Transfer Rules*, NCAA (Aug. 31, 2022, 4:45 PM), https://www.ncaa.org/news/2022/8/31/media-center-division-i-board-adopts-changes-to-transfer-rules.aspx. The NCAA has stated:

> Like their peers in the general student population, college athletes choose to transfer for any number of reasons . . . . We believe the changes enacted today enable member schools to adapt to students' needs, while also positioning students for long-term academic success. **These changes to NCAA rules recognize further study is needed on graduation rates before we consider authorizing multiple transfer opportunities with immediate eligibility**. We will continue to review potential modifications to transfer rules as the landscape evolves over time.

*Id.* (emphasis added). As the NCAA notes, it does not have compelling evidence or data to justify differential treatment between first-time and multiple-time transfers for college athletes. This is not a situation where the NCAA has put in place anticompetitive restrictions as to certain college athletes arising from empirical data or evidence. Instead, the NCAA simply thinks it best to restrain now, and find out if the restraint was necessary later. Without evidence to suggest that multiple-time transfers fare any better or worse academically than first-time transfers who have been offered immediate eligibility, the NCAA should treat all these college athletes equally.

According to statistics from the NCAA's 2019 Goals Study, Division I college athletes spend around 33 hours for Athletics, 35.5 hours for Academics, 14.5 hours for Socializing, and 85 hours on "Other" activities, including sleep, jobs, and other extracurriculars. NCAA, *Time Management* (Aug. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Student_Resources/Time_Management_DI_DII_DIII.pdf. *see also* Decl. of Noah Fenske, ¶ 9 (20 hours per week practicing with team, not including voluntary practice and conditioning despite not being able to compete); Decl. of Jarrett Hensley, ¶ 11 (over 25 hours per week toward basketball activity despite not being able to compete); Decl. of RaeQuan Battle, ¶ 21. The countable athletically related activities ("CARA") time limits under NCAA rules include supplemental workouts, competition, film review, practice, and strength and conditioning. *Time Management*; *see also* Decl. of Noah Fenske, ¶ 9; Decl. of Jarrett Hensley, ¶ 11. Thus, competition is only a part of the time a college athlete spends on athletics and is the only portion that the Transfer Rule sees fit to interfere with. *Time Management*; *see also GOALS Study: Understanding the Student-Athlete Experience*, presentation to the 2020 NCAA Convention (2020), https://ncaaorg.s3.amazonaws.com/research/goals/2020AWRES_GOALS2020con.pdf (where the same study by the NCAA found that the average days away from campus for athletic competition in 2019 for Division I athletes were as follows: 2.6 days for Baseball, 2.1 days for Men's Basketball, 1.2 days for FBS Football, 1.5 days for All Other Men's Sports, 2.4 days for Women's Basketball, and 2.0 days for all other women's sports). Given the portion of time spent on competition compared to all other types of athletic activities, the NCAA's refusal to allow multiple-time transfer college athletes from competing cannot be justified.

The NCAA's refusal to allow certain college athletes to compete immediately for their respective teams has caused, and continues to cause, ongoing harm to these college athletes.

16

Whether they participate in spring, fall, or winter sports, Division I college athletes face immediate and irreparable harm because of the Transfer Eligibility Rule.

   i.   **College athletes in winter sports that are ineligible under the Transfer Eligibility Rule face immediate and irreparable damage through the denial of the opportunity to compete in NCAA athletic events.**

For winter sport college athletes that are currently ineligible under the Transfer Eligibility Rule, the Rule's academic year of residence requirement causes immediate and irreparable harm by denying these college athletes the benefits of participating in NCAA Division I athletic events. This harm cannot be easily remedied and satisfied by monetary damages.

These college athletes are missing competitions now, games which cannot be replayed. Once the opportunity to play is gone it is truly gone. The missed opportunities for these college athletes continue to mount. Missing regular season games constitutes a significant impact on college athletes' opportunities to develop as players in gametime conditions, develop in-game experience with their teams, showcase their abilities to potential employers and, help their teams advance to the NCAA tournament. Decl. of RaeQuan Battle, ¶ 19, Decl. of Noah Fenske, ¶ 9.

Entrance to an NCAA tournament requires regular season success by teams. NCAA tournaments provide unique opportunities for exposure to the sport and players participating in the tournaments. Division I hosts 26 NCAA championships—13 in men's sports and 13 in women's sports—that annually give the thousands of college athletes who participate in them the experience of a lifetime. *Division I Championships*, NCAA, https://www.ncaa.org/sports/2021/5/11/division-i-championships.aspx (accessed Dec. 1, 2023). Championships are run by committees of coaches and administrators from NCAA member schools. *Id.* The absence of college athletes from teams on gameday negatively impacts a team's ranking and selection to an

NCAA tournament, and it may have life-altering impacts on the college athlete's ability to pursue a professional career in their sport. *See e.g.*, Decl. of RaeQuan Battle, ¶20.

In addition, the inability to compete in games essentially quashes any likelihood of NIL opportunities the college athlete may have received had they been allowed to compete during the season. Moreover, without playing time, these college athletes' opportunities to be scouted for professional leagues are severely diminished or even eliminated, hindering their future athletic careers. Every game is crucial for a college athlete; when compelled to sit out for reasons other than injury or legitimate academic reasons, these college athletes lose invaluable opportunities to showcase their talent and work for economic benefits. *See, e.g.*, Decl. of RaeQuan Battle, ¶¶ 23-24. These negative effects are particularly significant in the market for athletic services in men's and women's Division I basketball and FBS football. With the national media coverage dedicated to these sports, one good season—even one good game or tournament run—can cement an athlete's legacy in college sports. Furthermore, even slight differences in performance have significant impacts in professional league drafts. Thus, missing even a single game can irreparably harm a college athlete and have a substantial negative impact on their future earning potential. *See* Decl. of Noah Fenske, ¶¶ 9-10.

Finally, Division I college athletes, including those who will never play their sport professionally, experience harm in the form of negative mental health and overall well-being from being prevented from participating fully in their sport. *See, e.g*, Decl. of RaeQuan Battle, ¶3. While Defendant has expressed a commitment to bolstering the mental health and well-being of college athletes, enforcing the Transfer Eligibility Rule counteracts this commitment. It shuts out college athletes from competing in their chosen sport solely because of a decision to seek the

18

most beneficial environment for their well-being, a decision that non-athlete students—and even NCAA coaches—can make without a similar penalty.

The substantial and ongoing harm to winter sport Division I college athletes that are ineligible under the Transfer Eligibility Rule is irreparable and cannot be easily remedied and satisfied by monetary damages, making immediate temporary and preliminary injunctive relief a necessary remedy.

ii. **College athletes in spring and fall sports, all of which are currently in their transfer window, are immediately and irreparably harmed by the Transfer Eligibility Rule's chilling effect on transfer decisions and restriction of options of schools to which to transfer.**

Within NCAA Division I athletics, Bylaw 13.1.1.3.1 provides each sport has a specified window during which players may notify their current school of their intent to transfer enter their name into the NCAA's transfer portal process. Exhibit A at 75–76. As of the time of the filing of this motion, all fall and spring sports are in an active transfer window. NCAA, *NCAA Division I Transfer Windows* (Oct. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Transfer/DIUG_Windows.pdf.

With ongoing transfer windows in all fall and spring sports, college athletes in these sports are facing ongoing and irreparable harm through the Transfer Eligibility Rule's chilling effect on transfer decisions and limitation of schools among which these college athletes may be able to choose after deciding to transfer. Decl. of Noah Fenske, ¶ 6 (Transfer Eligibility Rule impact transfer decision-making process); *see also* Decl. of RaeQuan Battle, ¶¶ 4-9. College athletes, just like their non-athlete peers may choose to transfer schools for any number of reasons. Distance from family, academic environment, and athletic opportunities are only a few of the factors that may cause a college athlete to consider transferring. *See, e.g.,* Decl. of Jarrett Hensley, ¶ 8. The Transfer Eligibility Rule burdens this process with the threat of a year of

19

ineligibility should a college athlete decide to transfer. This risk may cause college athletes to forego opportunities to transfer that may be in their personal best interest. Without the restrictions of the Transfer Eligibility Rule, college athletes would be able to make the decision on whether to transfer solely based on what is in the college athlete's best interest and free from the burden of weighing the risk of a year of ineligibility under the Transfer Eligibility Rule.

Furthermore, college athletes subject to the Transfer Eligibility Rule who are currently in the transfer portal face potentially decreased options of schools to which to transfer because of the Rule. As noted above, the risk that a college athlete may not be immediately eligible upon transferring could make a Division I institution less likely to offer that athlete a scholarship position. This puts affected college athletes at an artificial competitive disadvantage compared to transferring college athletes who are excepted from the Transfer Eligibility Rule. Without the threat of ineligibility imposed by the Transfer Eligibility Rule, affected college athletes would be on equal footing with all other college athletes in the transfer portal, and NCAA member institutions would be able to offer scholarships based on their evaluation of a college athlete without the risk that the college athlete will not be immediately eligible upon transferring.

Given the harm imposed by the Transfer Eligibility Rule and the open transfer windows in all fall and spring sports, college athletes in these sports face immediate and irreparable harm from the Transfer Eligibility Rule. Temporary and preliminary injunctive relief is necessary to prevent this ongoing harm and allow college athletes to make transfer decisions—ones which can affect their lives for years to come—based solely on their own best interests and unburdened by the restrictions of the Transfer Eligibility Rule.

### iii. For this Court's injunctive relief to be effective, the NCAA must be enjoined from enforcing Bylaw 12.11.4.2.

The Rule of Restitution, in a nutshell, provides that, if a plaintiff obtains an injunction against the unlawful conduct of the NCAA, and a college athlete and his or her member institution conduct themselves in conformity with that injunction, the NCAA may impose draconian punishments on both the athlete and the institution if the injunction is "vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified." Exhibit A at 66–67.

The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. For example, a college athlete could obtain a preliminary injunction to play during his final year of eligibility and, once the season is over, not wish to incur the cost and effort of continuing to litigate and instead wish to voluntarily dismiss. Alternatively, a court could determine that the athlete's eligibility had ended and the case is thereby mooted, resulting in dismissal. In both instances, the NCAA could impose harsh penalties in retaliation against the college athlete and the athlete's school even though the only court to consider the issue had ruled in the college athlete's favor.

Knowing this, many universities will not permit college athletes who challenge NCAA rules in court to compete, even if a court issues a temporary restraining order or preliminary injunction finding that those rules are likely illegal. This, in turn, deters college athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

The Rule of Restitution's purpose and effect is to deter challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual college athletes and member universities of the practical ability to rely on court orders in their favor. Thus, the Rule of Restitution is itself a means of preventing defection

from the anticompetitive agreement by member schools and of weaponizing the delay inherent in the litigation process to deter college athletes from mounting challenges to the antitrust merits of the NCAA's rules.

Absent relief enjoining the Rule of Restitution, if this Court was to determine preliminarily that the Transfer Eligibility Rule is unlawful, preliminarily enjoin its enforcement, and permit two-time transfer athletes to compete for their respective schools, their schools still may not play them for fear of future retaliation by the NCAA.

Because of the Rule of Restitution, college athletes run the risk of severe personal punishment and the risk of subjecting their schools or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. The rule amounts to the NCAA effectively deciding for itself the rules of interim relief rather than the courts. This deprives college athletes of the practical ability to rely on a court's temporary or preliminary injunctive relief in their favor. The Rule of Restitution is also a means of enforcing cartel-style discipline among the NCAA's member institutions, preventing defection, and manipulating rules of mootness to discourage challenges to the rules. For temporary or preliminary injunctive relief from this court to be effective, that relief must enjoin Defendant from punishing college athletes and member institutions under the Rule of Restitution simply for doing what a court of law prescribed for them to do.

**C. The balance of the equities tip in Plaintiffs' favor.**

The balance of the equities supports Plaintiffs' motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the Transfer Eligibility Rule. As noted above, college athletes ineligible for competition under the Transfer Eligibility Rule face immediate and irreparable harm for every athletic contest they are forced to sit out.

Furthermore, student athletes considering a transfer or already searching for a new institution in the active transfer windows are artificially disadvantaged by the threat of a year of ineligibility under the Transfer Eligibility Rule and face immediate and irreparable harm each day the transfer windows get closer to closing. The equities favor allowing these college athletes to realize the present and future economic potential of their participation in college athletics and allowing college athletes in the transfer process to use the market to respond to changing circumstances and seek the most beneficial situation for their own well-being unencumbered by the threat of ineligibility under the Transfer Eligibility Rule.

On the other hand, no substantial harm to Defendant would result from the granting of temporary and preliminary injunctive relief. A prohibition on enforcing the Transfer Eligibility Rule causes no harm—economic or otherwise—to Defendant or any other entity or individual. Defendant already allows one initial transfer to college athletes without the restrictions of the Transfer Eligibility Rule, thus demonstrating that Defendant experiences no real harm in allowing the college athlete to fully compete in a sport upon transferring to another university. Temporary and preliminary injunctive relief for Plaintiffs would not force the Defendant to take any action at all or incur any damages. Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing college athletes to compete in athletic events already scheduled to take place. This adds no cost to the NCAA's administration of these athletic contests but would allow affected winter sport college athletes to compete with their teammates unencumbered by the restrictions of the Transfer Eligibility Rule. Furthermore, the transfer portal process is already underway in all fall and spring sports for the open transfer windows. Allowing second-time transfers to enter their names in the transfer portal adds little to no burden on the NCAA, as the process of transferring places the onus on college athletes and coaches to

use the transfer market to find efficient matches between college athletes and new institutions to which they transfer. The impact of injunctive relief would greatly benefit these college athletes while imposing no burden to the NCAA. Thus, the balance of the equities tips in Plaintiffs' favor and supports issuance of temporary and preliminary injunctive relief preventing the enforcement of the Transfer Eligibility Rule.

**D. Injunctive relief serves the public interest of promoting free and fair competition in labor markets.**

Temporary and preliminary injunctive relief preventing Defendant from enforcing the Transfer Eligibility Rule would serve the public interest in promoting free and fair competition in labor markets guaranteed by the antitrust laws. Despite the absence of a formal employee-employer relationship between NCAA member institutions and college athletes, the commercial nature of transactions between these institutions and college athletes creates the functional equivalent of a labor market in NCAA athletics. College athletes compete for scholarship positions on NCAA rosters, and NCAA member institutions compete for the best college athletes, providing them with scholarships and other benefits to attend the institution in exchange for participation on a given athletic team. Free and fair competition in labor markets is essential to the American economy, but anticompetitive restrictions in these markets harm both workers and the overall economy. Protecting competition in the labor market for NCAA Division I college athletes serves the public's interest in free and fair competition in labor markets.

**V.     SECURITY**

Plaintiffs respectfully request that this Court not require security prior to issuing a temporary restraining order or preliminary injunction in this case. Should this court issue initial injunctive relief, Defendant will not suffer financial burden in compliance with such injunctive relief. The requested injunctive relief would not require any affirmative steps on the part of

24

Defendant. Rather, it would prevent Defendant from enforcing the Transfer Eligibility Rule against college athletes and enforcing the Rule of Restitution against college athletes or member institutions. Because initial injunctive relief would prevent Defendant from taking action rather than require any action from Defendant, Plaintiffs request that this Court not require security prior to issuing a temporary restraining order or preliminary injunction in this case.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order enjoining Defendant from enforcing the Transfer Eligibility Rule, NCAA Bylaw 14.5.5.1, pending entry by the Court of a final judgment in this action. Further, Plaintiffs respectfully request that this Court enjoin Defendant from retaliating against college athletes or NCAA member institutions by punishing them under the Rule of Restitution, NCAA Bylaw 12.11.4.2, for conduct allowed by any temporary or preliminary injunctive relief that this Court may issue.

Dated: December 7, 2023

DAVE YOST
OHIO ATTORNEY GENERAL

Erik Clark
Deputy Attorney General for Major Litigation

Jennifer L. Pratt
Director of Major Litigation

Beth A. Finnerty
Section Chief, Antitrust Section


_s/ Steven Oldham_
Steven Oldham (_pro hac vice_ forthcoming)
Assistant Attorney General, Major Litigation

_s/ Edward J. Olszewski_
Edward J. Olszewski (_pro hac vice_ forthcoming)
Assistant Section Chief, Antitrust Section

_s/ Derek M. Whiddon_
Derek M. Whiddon (_pro hac vice_ forthcoming)
Assistant Attorney General, Antitrust Section

Office of the Ohio Attorney General
30 E. Broad St., 26th Floor
Columbus, OH 43215
Telephone: (614) 466-4328
Email: Steven.Oldham@OhioAGO.gov
         Edward.Olszewski@OhioAGO.gov
         Derek.Whiddon@OhioAGO.gov

_Attorneys for Plaintiff State of Ohio_

**FOR PLAINTIFF STATE OF COLORADO**

PHILIP J. WEISER
ATTORNEY GENERAL


  */s/ Bryn Williams*　　　　　　　　
BRYN WILLIAMS
First Assistant Attorney General
ELIZABETH W. HEREFORD
Assistant Attorney General

Colorado Department of Law
Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 7th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email:  Bryn.Williams@coag.gov
　　　　Elizabeth.Hereford@coag.gov

*Attorneys for Plaintiff State of Colorado*

**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL, ATTORNEY GENERAL

*/s/ Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER, Chief, Antitrust Bureau

Elizabeth L. Maxeiner, Chief, Antitrust Bureau
Brian M. Yost, Assistant Attorney General, Antitrust Bureau


Office of the Illinois Attorney General
100 W. Randolph St., Fl. 11
Chicago, IL 60601
Phone: (773) 790-7935
Elizabeth.maxeiner@ilag.gov
Brian.yost@ilag.gov

*Attorneys for the Plaintiff State of Illinois*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
ATTORNEY GENERAL

Christopher D'Angelo
Chief Deputy Attorney General,
Economic Justice Division

_s/ Elinor R. Hoffmann_
Elinor R. Hoffmann (_pro hac vice_ forthcoming)
Chief, Antitrust Bureau

_s/ Amy McFarlane_
Amy McFarlane (_pro hac vice_ forthcoming)
Deputy Chief, Antitrust Bureau

_s/ Bryan Bloom_
Bryan Bloom (_pro hac vice_ forthcoming)
Senior Enforcement Counsel, Antitrust Bureau

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269 (Hoffmann)
Email: Elinor.Hoffmann@ag.ny.gov
        Amy.McFarlane@ag.ny.gov
        Bryan.Bloom@ag.ny.gov

_Attorneys for Plaintiff State of New York_

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
ATTORNEY GENERAL OF NORTH CAROLINA

*/s/ Jonathan R. Marx*
JASMINE MCGHEE*
Senior Deputy Attorney General
JONATHAN R. MARX*
Special Deputy Attorney General
KUNAL CHOKSI*
Special Deputy Attorney General

North Carolina Department of Justice
114 W. Edenton St
Raleigh, NC 27603
Telephone: (919) 716-8611
Email: jmarx@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**pro hac vice* motions pending

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
ATTORNEY GENERAL AND REPORTER

*/s/ J. David McDowell*
J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS
Senior Assistant Attorney General
TYLER T. CORCORAN
Assistant Attorney General

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Phone: (615) 741-8722
Email: David.McDowell@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

**FOR PLAINTIFF STATE OF WEST VIRGINIA
AND AS LOCAL COUNSEL FOR THE PLAINTIFF
STATES OF OHIO, COLORADO, ILLINOIS,
NEW YORK, NORTH CAROLINA, AND TENNESSEE**

STATE OF WEST VIRGINIA ex rel.
PATRICK MORRISEY, ATTORNEY GENERAL

*/s/ Michael R. Williams*
Michael R. Williams, Principal Deputy Solicitor General
Douglas L. Davis, Sr. Assistant Attorney General
Matthew M. Morrison, Assistant Attorney General

Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Ph. (304) 558-8986
Fax. (304) 558-0184
Michael.R.Williams@wvago.gov
Douglas.L.Davis@wvago.gov
Matt.M.Morrison@wvago.gov

*Counsel for Plaintiff State of West Virginia and
Local Counsel for Plaintiff States of Ohio, Colorado,
Illinois, New York, North Carolina, and Tennessee*