**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

STATE OF OHIO, STATE OF COLORADO,
STATE OF ILLINOIS, STATE OF NEW YORK,
STATE OF NORTH CAROLINA, STATE OF
TENNESSEE, AND STATE OF WEST
VIRGINIA

                    Plaintiffs,

      v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

                  Defendant.

Case No. 1:23-CV-00100

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant, National Collegiate Athletic Association ("NCAA"), by and through

undersigned counsel, submits this Memorandum of Law in Opposition to Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD...................................................................................................... 2

ARGUMENT................................................................................................................... 3

     I.     Plaintiffs' Claims Fail on the Merits.................................................................... 3

          A.     The Sherman Act is Not an Appropriate Means of Challenging the Supposed Arbitrariness of NCAA Rules ..................................................... 4

          B.     Plaintiffs' Have Not Shown the Bylaw Delaying Two-Time Transfer Student-Athletes Eligibility is an Unreasonable Restraint of Trade ........................................................................................................ 5

          C.     Plaintiffs Provide No Legal Basis to Enjoin Enforcement of Bylaw 12.11.4.2........................................................................................... 14

     II.     Plaintiffs Have Not, and Cannot, Establish Irreparable Harm............................ 14

     III.     The Balance of Equities Weighs Against an Injunction ...................................... 15

     IV.     The Public Interest is Not Served Through an Injunction ................................... 17

CONCLUSION.............................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albany Acads. v. New York State Pub. High Sch. Athletic Ass'n,*
    145 A.D.3d 1258 (N.Y. App. 2016) ........................................................................5

*Am. Needle, Inc. v. NFL,*
    130 S. Ct. 2201 (2010) .............................................................................................6

*Antietam Battlefield KOA v. Hogan,*
    461 F. Supp. 3d 214 (D. Md. 2020) *aff'd in relevant part,* No. 20-2311,
    2022 WL 1449180 (4th Cir. May 9, 2022) .............................................................14

*Blackshire v. N.A.A.C.P., Inc.,*
    673 N.E.2d 1059 (Ill. App. 1996) ...........................................................................4

*Butler v. NCAA,*
    2006 WL 2398683 (D. Kan. Aug. 15, 2006) ...........................................................5

*Cole v. NCAA,*
    120 F. Supp. 2d 1060 (N.D. Ga. 2000) ....................................................................5

*Cont'l Airlines, Inc. v. United Air Lines, Inc.,*
    120 F. Supp. 2d 556 (E.D. Va. 2000) ......................................................................9

*Cont'l Airlines, Inc. v. United Airlines, Inc.,*
    277 F.3d 499 (4th Cir. 2002) ...................................................................................5

*Deppe v. Nat'l Collegiate Athletic Ass'n,*
    893 F.3d 498 (7th Cir. 2018) ...................................................................................7

*Di Base v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ...................................................................................1

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) ...............................................................................3, 9

*Direx Israel, Ltd. v. Breakthrough Medical Corp.,*
    952 F.2d 802 (4th Cir. 1991) .................................................................................14

*eBay, Inc. v. MercExchange. LLC,*
    547 U.S. 388 (2006) ................................................................................................2

*Gaines v. NCAA,*
    746 F. Supp. 738 (M.D. Tenn. 1990) ......................................................................6

*Gregor v. West Virginia Secondary Schools Athletic Commission*,
No. 2:20-cv-00654, 2020 WL 5995075 (S.D. W.Va. Oct. 9, 2020) (TRO),
No. 2:20-cv-00654, 2020 WL 6292813 (S.D. W.Va. Oct. 27, 2020) (PI)...............15

*Hart v. Nat'l Coll. Athletic Assn.*,
550 S.E.2d 79 (W. Va. 2001)..............................................................15

*Jones v. NCAA*,
679 So.2d 381 (La. 1996) ..................................................................5

*McAdoo v. Univ. of N. Carolina at Chapel Hill*,
736 S.E.2d 811 (N.C. App. 2013)........................................................4

*McCormack v. NCAA*,
845 F.2d 1338 (5th Cir. 1988) ...........................................................7

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).......................................................................12

*In re Microsoft Corp. Antitrust Litig.*,
333 F.3d 517, 525 (4th Cir. 2003) .......................................................2

*Mil. Servs. Realty, Inc. v. Realty Consultants of Virginia, Ltd.*,
823 F.2d 829 (4th Cir. 1987) .............................................................9

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 ..............................................................................6, 11

*NCAA v. Alston*,
141 S. Ct. 2141 (2021).............................................................*passim*

*NCAA v. Lasege*,
53 S.W.3d 77 (Ky. 2001) ..................................................................5

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)................................................................8, 12

*Petrie v. Virginia Bd. of Med.*,
648 F. App'x 352 (4th Cir. 2016) .......................................................9

*Pocono Invitational Sports Camp, Inc. v. National Collegiate Athletic Ass'n*,
317 F. Supp. 2d 569 (E.D. Pa. 2004) ....................................................9

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) .........................2

*Rum Creek Coal Sales, Inc. v. Caperton*,
926 F.2d 353 (4th Cir.1991) ..............................................................2

*Shelton v. NCAA*,
    539 F.2d 1197 (9th Cir. 1976) ...........................................................................5

*Smith v. NCAA*,
    139 F.3d 180 (3d Cir. 1998), *vacated on other grounds,* 525 U.S. 459 (1999)........................6

*Stinnie v. Holcomb*,
    77 F.4th 200 (4th Cir. 2023) ..........................................................................3

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994) ..........................................................................2

*Tennessee Secondary School Athletic Ass'n v. Cox*,
    425 S.W.2d 597 (Tenn. 1968) ..........................................................................5

*The Real Truth About Obama, Inc. v. Fed. Elections Comm'n.*,
    575 F.3d 342 (4th Cir. 2009) .........................................................................14

*Tiffany v. Forbes Custom Boats, Inc*.,
    No. 91-2001, 1992 WL 67358 (4th Cir. Apr. 6, 1992) ..................................................2

*State ex rel. W. Virginia Secondary Sch. Activities Comm'n v. Hummel*,
    769 S.E.2d 881 (W. Va. 2015).........................................................................4

*Winter v. Natural Res. Def. Council, Inc*.,
    555 U.S. 7 (2008)....................................................................................3

*Wootten v. Commonwealth of Virginia*,
    168 F. Supp. 3d 890 (W.D. Va. 2016) ................................................................14

**Statutes**

Clayton Act Section 16, 15 U.S.C. § 26 ................................................................3

Sherman Act..........................................................................................2, 4

Sherman Act Section 1, 15 U.S.C. § 1.............................................................3, 5, 9, 14

**Other Authorities**

Shawn Jeffrey Waltz, *2+2: Academic Success Predictors of Two-Year Transfer
    Student Athletes*, University of New Orleans Theses and Dissertations, xvii
    (2022) https://scholarworks.uno.edu/cgi/viewcontent.cgi?
    article=4247&context=td ............................................................................13

*Two-Year Transfer Student Athletes*, University of New Orleans Theses and
    Dissertations, xvii (2022) https://scholarworks.uno.edu/cgi/viewcontent.cgi?
    article=4247&context=td ............................................................................13

*Undergraduate GPA*, 10 RPA J. 39, 40 (2015),
      https://files.eric.ed.gov/fulltext/EJ1064764.pdf.......................................................................13

## INTRODUCTION

The States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia (collectively, "Plaintiffs") seek to remake collegiate athletics and replace it with a system of perpetual and unchecked free agency by asking this Court to eliminate the Transfer Eligibility Rule (the "Rule") because it violates antitrust law. The Rule permits all student-athletes to transfer once without cause, but it also requires student-athletes to either defer their eligibility to play for one year when they transfer schools for a second time or obtain a waiver of the Rule. The Rule is necessary to protect the academic interests of the student and the stability and competitive balance of collegiate athletics. But Plaintiffs do not like it.

Plaintiffs argue that the Rule is anticompetitive because in some situations a player's eligibility is delayed for one year after transfer. Plaintiffs therefore propose to rewrite the rule of a private association, the National Collegiate Athletic Association ("NCAA"), and its nationwide application, and argue that collegiate athletics would be better off with an alternate rule allowing virtually unlimited student-athlete transfers with immediate eligibility. But Plaintiffs offer virtually no facts or legal authority to support their proposed change to an NCAA eligibility rule. Consequently, Plaintiffs fall woefully short of their burden to "clearly establish entitlement to the relief sought." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

Plaintiffs' request should be denied for several reasons: (1) Plaintiffs have failed to allege irreparable harm under Fourth Circuit and West Virginia law, (2) they cannot meet the extraordinary standard required for a mandatory injunction, (3) they have not shown any likelihood of success on the merits of their antitrust claim, and (4) the balance of equities weighs strongly in favor of the NCAA, not Plaintiff.

## <u>LEGAL STANDARD</u>

The standard for granting either a temporary restraining order ("TRO") or a preliminary injunction is the same. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991). "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Roe v. Dep't of Def*., 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (internal quotation marks omitted). The purpose of a preliminary injunction "is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 525 (4th Cir. 2003), abrogated on other grounds by *eBay, Inc. v. MercExchange. LLC*, 547 U.S. 388 (2006). To that end, "preliminary injunctions are extraordinary interlocutory remedies that are granted in limited circumstances and then only sparingly." *In re Microsoft*, 333 F.3d at 526.

The bar is raised even further where Plaintiffs seek a mandatory injunction—*i.e*., an injunction that upsets, rather than maintains, the status quo. *In re Microsoft Corp. Antitrust Lit.,* 333 F.3d at 525. Here, Plaintiffs seek to change the status quo by rewriting or eliminating the currently effective rule. The Fourth Circuit, however, disfavors mandatory injunctions in *any* circumstance and permits them in only "the most extraordinary" situations. *Taylor v. Freeman,* 34 F.3d 266, 270 n. 2 (4th Cir. 1994). And since mandatory injunctions are disfavored, they require the plaintiffs to "satisfy an even heavier burden of showing the four factors . . . weigh heavily and compellingly in its favor." *Tiffany v. Forbes Custom Boats, Inc*., No. 91-2001, 1992 WL 67358 at *20 (4th Cir. Apr. 6, 1992) (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991)).

For entitlement to this extraordinary relief, Plaintiffs must establish through clear evidence that they are (1) likely to succeed on the merits of their Sherman Act claim, (2) that they are likely

to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Plaintiffs bear the burden of proof on each factor. *Id*.

## ARGUMENT

Here, Plaintiffs offer literally no facts or legal authority capable of meeting their heavy burden to show that each factor weighs heavily and compellingly in their favor. First, Plaintiffs cannot establish a "clear showing" their claim is likely to succeed on the merits. *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th Cir. 2023). Second, Plaintiffs have not, and cannot, demonstrate the likelihood of suffering irreparable harm under Fourth Circuit law. Finally, the balance of equities and public interest weigh heavily in favor of the NCAA, not Plaintiffs.

## I.     Plaintiffs' Claims Fail on the Merits.

Plaintiffs bring a single claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, pursuant to Section 16 of the Clayton Act ("Section 16"), 15 U.S.C. § 26. For purposes of a TRO, Plaintiffs must establish that they are likely to succeed on their claim under Section 1, which requires proof of "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp*., 309 F.3d 193, 202 (4th Cir. 2002).

To justify their request for relief, Plaintiffs misread and misrepresent *NCAA v. Alston*, the central pillar of supposed support for their position that they—not the NCAA—ought to decide what is best for student athletes. 141 S. Ct. 2141 (2021). Plaintiffs contend *Alston* invites any and all challenges to NCAA Bylaws, even rules that in no way relate to the narrow issue in *Alston*: limitations on education related benefits. Plaintiffs dismiss *Alston*'s clear warning that "antitrust courts must give wide berth to business judgments." *Id*. at 2163. But as stated in *Alston*:

> Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations—as generalists, as lawyers, and as outsiders trying

to understand intricate business relationships. Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare.

*Id*. at 2166.

Despite this admonition, Plaintiffs do not ask the Court to throw out all rules limiting the mobility of student-athletes, just that it rewrite the Rule in a way they prefer. Specifically, Plaintiffs would like student-athletes to freely change schools whenever they want with immediate eligibility. In their view, seven state attorneys general should decide the rules governing college athletics rather than the NCAA, an association created for that very purpose, or the schools, professors, chancellors, counselors, and student-athletes that comprise that association.

### A. The Sherman Act is Not an Appropriate Means of Challenging the Supposed Arbitrariness of NCAA Rules.

The initial misstep of the Plaintiffs is their effort to meddle in the decisions of a private association. Plaintiffs apparently are under the impression that *Alston* opened the floodgates to challenge any NCAA rule. That is not so. The antitrust laws are not an appropriate avenue for challenging what Plaintiffs call an "arbitrary rule." Pls'. Mem. at 1. In substance, Plaintiffs ask this court to serve as "central planner"—the exact role to which the Supreme Court said judges "should never aspire." *Alston*, 141 S. Ct. at 2163–64.

In seeking to intervene in the affairs of a private association and make the Rule more transfer-friendly, Plaintiffs ignore clearly established law in this State, and those of the other Plaintiff-states. *See e.g.*, *State ex rel. W. Virginia Secondary Sch. Activities Comm'n v. Hummel*, 769 S.E.2d 881, 885–86 (W. Va. 2015) ("As a general rule courts should not interfere with the internal affairs of school activities commissions or associations."); *McAdoo v. Univ. of N. Carolina at Chapel Hill*, 736 S.E.2d 811, 825 (N.C. App. 2013) ("In North Carolina, '[i]t is well established that courts will not interfere with the internal affairs of voluntary associations.'"); *Blackshire v.*

4

*N.A.A.C.P., Inc*., 673 N.E.2d 1059, 1061 (Ill. App. 1996) ("It is well established that courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud or lack of jurisdiction."); *Tennessee Secondary School Athletic Ass'n v. Cox*, 425 S.W.2d 597, 601 (Tenn. 1968) ("It is a well-settled principle of law that the courts in Tennessee should not interfere in the affairs of an association or private corporation in the absence of proof of bad faith or fraud on the part of those entrusted with its management."); *Albany Acads. v. New York State Pub. High Sch. Athletic Ass'n,* 145 A.D.3d 1258, 1261 (N.Y. App. 2016) (finding transfer rule designed to "to deter athletic school-shopping and the recruitment of high school athletes by schools[,]" did not "warrant [the court's] interference.").

Numerous cases challenging NCAA decisions have reached the same conclusion. *See, e.g.*, *Cole v. NCAA*, 120 F. Supp. 2d 1060, 1072 (N.D. Ga. 2000) ("[T]his court is reluctant to replace the NCAA subcommittee as the decision-maker on private waiver applications."); *Jones v. NCAA*, 679 So.2d 381, 382 (La. 1996) (declining to "interfere with the internal affairs of a private association"); *Shelton v. NCAA*, 539 F.2d 1197, 1198 (9th Cir. 1976) ("It is not judicial business to tell a voluntary athletic association how best to formulate or enforce its rules."); *Butler v. NCAA*, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006); *NCAA v. Lasege*, 53 S.W.3d 77, 85 (Ky. 2001).

### B. Plaintiffs Have Not Shown the Bylaw Delaying Two-Time Transfer Student-Athletes Eligibility is an Unreasonable Restraint of Trade.

Any Section 1 claim requires a showing that the alleged restraint on competition is unreasonable. *Cont'l Airlines, Inc. v. United Airlines, Inc*., 277 F.3d 499, 508 (4th Cir. 2002). A plaintiff cannot prove the unreasonableness of a restraint merely by showing that it caused economic injury. *Id.*

When examining the NCAA's rules under the antitrust laws, courts apply the rule of reason, not a per se analysis.[1] Unlike a per se violation, which are condemned without extensive inquiry, a challenge under the rule of reason is a fact-intensive analysis that turns on whether the challenged conduct ultimately promotes or impairs competition. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104; *Am. Needle, Inc., v. NFL*, 130 S. Ct. 2201, 2216 (2010). Because college sports would not exist at all without rules and enforcement, and because NCAA regulation makes possible a distinctive product, there is a strong presumption "that most of the regulatory controls of the NCAA are … procompetitive." *Regents*, 468 U.S. at 117, 102; *see also Am. Needle*, 130 S. Ct. at 2216 (sports league rules are "likely to survive the Rule of Reason").

### 1.    Eligibility Rules are Procompetitive.

Each court that has examined NCAA eligibility rules has readily upheld them. As one court explained, "[t]he overriding purpose of the eligibility rules . . . is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent commercializing influences from destroying the unique 'product' of NCAA college football." *Gaines v. NCAA*, 746 F. Supp. 738, 744 (M.D. Tenn. 1990).

Courts addressing NCAA eligibility rules typically apply an abbreviated analysis that involves a presumption that the rule is procompetitive. *Agnew*, 683 F.3d at 343 ("Most—if not all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness."); *Smith v. NCAA*, 139 F.3d 180, 186-87 (3d Cir. 1998), *vacated on other grounds,* 525 U.S. 459 (1999) (noting that "the Supreme Court has recognized the procompetitive nature of many of the NCAA's . . . eligibility requirements" and holding that those requirements "allow for the survival

---

[1] Per se treatment is generally limited to restraints that have no possible competitive merit. Such is not the case with NCAA rules, which are needed for college sports to exist at all. *Regents*, 468 U.S. at 101, 104.

of the product, amateur sports, and allow for an even playing field"); *McCormack v. NCAA,* 845 F.2d 1338, 1345 (5th Cir. 1988) (concluding that NCAA eligibility rules do not violate antitrust laws because they "create the product and allow its survival in the face of commercializing pressures").

Indeed, the Seventh Circuit concluded the year-in-residence rule, a more restrictive version of the current Rule that did not give student-athletes one transfer with immediate eligibility, was procompetitive. *Deppe v. Nat'l Collegiate Athletic Ass'n,* 893 F.3d 498 (7th Cir. 2018). The *Deppe* court recognized that "[w]ithout transfer restrictions, the players in these high-revenue sports could be traded like professional athletes." *Id.* at 503. The court found the year-in-residence rule procompetitive not out of formalism and outright deference, but because of a common-sense understanding that without any rules regulating transfer, collegiate athletics would be no different than professional sports and the product itself would cease to exist.

Plaintiffs apparently agree. They point to "bylaws preventing in-season transfers" as being necessary to "keep NCAA athletics from becoming a free agent market like those in professional sports, as a college athlete unhappy with how a current season is going cannot demand a transfer only to compete for another member institution in the same athletics season." Pls'. Mem. at 13-14. In short, Plaintiffs argue that restrictions on transfer are necessary and procompetitive. They simply posit, without any evidence, that season-to-season transfers would not lead to a system where "players in these high-revenue sports could be traded like professional athletes," while in-season transfers would create such a system. *Deppe*, 893 F.3d at 503. Plaintiffs ask this Court, rather than the NCAA, to draw the line on where collegiate sports end and professional sports begin, in disregard for *Alston*'s directive that "[j]udges must be mindful, too, of their limitations— as generalists, as lawyers, and as outsiders trying to understand intricate business relationships."

141 S. Ct. at 2166.

    **2.**    **Even under the Rule of Reason, Plaintiffs Do Not Meet Their Burden of Proving Substantial Anticompetitive Effects.**

Under the rule of reason, "a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The first step is that "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If a plaintiff meets this burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If a defendant provides this rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

Plaintiffs have not met their initial burden under the rule of reason of proving "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Plaintiffs assert that the Rule harms college athletes in two markets: "(1) athletic services in men's and women's Division I basketball and football bowl subdivision ("FBS") football, wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market." Pls'. Mem. at 5.

Without any evidence whatsoever, Plaintiffs contend that the Rule governing multiple transfers are "like the compensation-related restrictions at issue in *Alston*." *Id.* at 6. This conclusory statement is woefully inadequate, and incorrect. *Alston* is distinguishable for numerous reasons, particularly as to competitive effects. *Alston* addressed rules capping education-related aid and affected all student-athletes, *i.e.*, all student-athletes in Division I. In contrast, the Rule at issue here implicates only student-athletes transferring for a second or additional time. Over the past five years, only 0.17% of the undergraduate student-athlete population has transferred more than

once and sought immediate eligibility to compete in college athletics. *See* Ex. A, Hataway TRO Decl. ¶ 15 (explaining that since September 2018, the NCAA has received only 891 waiver requests from the more than 520,000 student-athletes). Consequently, even assuming, *arguendo*, Plaintiffs have defined a relevant "labor market," there is nothing more than de minimis impact on the participants in these alleged markets. *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 562 (E.D. Va. 2000) ("Section 1 does not reach de minimis restraints of trade."). Plaintiffs simply disregard the black-letter principle that the "antitrust laws were designed to protect competition, not competitors," *Petrie v. Virginia Bd. of Med.,* 648 F. App'x 352, 355 (4th Cir. 2016); *Mil. Servs. Realty, Inc. v. Realty Consultants of Virginia, Ltd*., 823 F.2d 829, 832 (4th Cir. 1987).

Plaintiffs focus on individual claims as evidence of competitive effects but provide absolutely no evidence of "harm to the competitive *process* … thereby harm[ing] consumers." *Dickson*, 309 F.3d at 206; *see also Pocono Invitational Sports Camp, Inc. v. National Collegiate Athletic Ass'n*, 317 F. Supp. 2d 569 (E.D. Pa. 2004) (stating that "actual anticompetitive effects" include "reduction of output, increase in price, or deterioration in quality of goods or services").

### 3.    The NCAA's Many Procompetitive Justifications for Limiting Two-Time Transfers.

Even if the Court were to recognize Plaintiffs' "competitive effects" on a handful of student-athletes in a pool of hundreds of thousands of student athletes, Plaintiffs concede that any such effect must be assessed with the understanding that "some degree of coordination between competitors within sports leagues can be procompetitive," for without agreed upon rules of a given sport, "the very competitions that consumers value would not be possible." Pls'. Mem. at 6 (citing *Alston* at 2156).

To elaborate, the second-time transfer rules aim to promote academic success by minimizing the significant potential disruption from multiple transfers, promoting the benefits of team continuity and predictability, and protecting the viability of collegiate sports by preserving some level of competitive balance between programs and some level of continuity in the makeup of teams. *See* Hataway TRO Decl. ¶ 18.

First, while the NCAA plays a major role in inter-collegiate athletics, the NCAA is also charged with fostering an environment that ensures that student-athletes have an opportunity for academic success and that they will be well-placed to earn an undergraduate degree. *Id.* ¶ 9. To that end, its rules are intended to serve student-athletes in several ways. Primarily, the rules are driven by an interest in ensuring the academic success of the transferring student as he or she works toward an undergraduate degree. *Id.* ¶¶ 9-14. The Rule at issue is no different. It is "driven by an interest in ensuring the academic success of the transferring student as he/she works toward an undergraduate degree." *Id.* ¶ 13. The Rule allows student-athletes who transfer more than once to acclimate to their new school and focus on education, furthering their progress toward a degree. *Id.*

NCAA membership has recognized that this may not be the case for every student-athlete who transfers multiple times, and that there are many individualized circumstances that could change the academic-athletic balance calculus for student-athletes. As a result, the rules include a waiver process that allows undergraduate student-athletes to petition for an exemption from the year-in-residency requirement for those who transfer more than once. *Id.* ¶¶ 14–35. [2]

---

[2] There are numerous eligibility waivers available to second-time-transferring athletes, including when an institution discontinues a major course of study or discontinues or nonsponsors the sport. Hataway TRO Decl. ¶ 23. Another is for student-athletes who transfer for reasons related to the student-athlete's physical or mental health and well-being, due to exigent circumstances outside the student-athlete's control, or assertions involving diagnosed education impacting disabilities.

Second, the NCAA member schools have developed eligibility rules—like the transfer rules—to ensure fair competition in sports, to enhance the product of collegiate sports, to maintain a balance between academics and athletics for collegiate student-athletes, and to ensure that collegiate sporting events continue to attract the interests of fans. *Id.* ¶¶ 10-11. Eligibility rules include ensuring that the teams are made up of student-athletes that are actually enrolled at the school they represent, that collegiate athletes carry a minimum number of credit hours, attend classes and meet minimum academic requirements, and that collegiate athletes are generally not professional athletes. *Id.*

Third, the current Rule also provides benefits for teams and non-transferring college athletes in the form of order and predictability. *Id.* ¶ 18–19. The Rules protect team continuity and allow teams to plan for the next season, and to recruit new high school students by limiting the timing of transfers and the process for transfers. Non-transferring team members do not face the distraction of in-season roster changes or the need to recruit throughout the competition season.

The transfer rules also serve an important purpose in protecting the viability of collegiate sports and teams so that collegiate sports remain attractive to consumers and fans. This directly speaks to what has long been recognized by the Supreme Court: "The NCAA and its members market competition itself—contests between competing institutions." *Regents*, 468 U.S. at 86. Collegiate athletics remain popular in part due to the nature of athletic competition attained by preserving some level of competitive balance between programs and some level of continuity in the makeup of the teams.

---

The only exception that Plaintiffs seem to be concerned with here is the waiver for an athlete's physical or mental health or well-being, which reveals that Plaintiffs' concerns are not truly about antitrust issues or the exceptions to the transfer rule writ-large, but about how the NCAA interprets and administers its Bylaws with respect to certain athletes such as RaeQuan Battle.

11

Plaintiffs argue that the procompetitive justifications "are pretextual." Whatever the import of that statement, Plaintiffs cite nothing to support their contention. Pls'. Mem. at 10.[3] As explained above, the reality is that there are many procompetitive justifications for regulating two-time transfers. The current rules seek to balance all of these considerations—the academic interest of the student, the need in some cases for students to transfer, the availability of waivers of the Rule for multiple transfer students in some cases, the need of coaches and teams to have predictability and certainty around rosters, and consumer/fan interest in team continuity and competitive balance. All these things clearly promote competition.

### 4.    Plaintiffs' Proffered Less Restrictive Alternative Would Not Achieve The Procompetitive Objectives of the Current Bylaw.

Plaintiffs fail on the third step of the rule of reason analysis, which requires proving "that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Am. Ex.*, 128 S. Ct. at 2284. As discussed above, Plaintiffs suggest that "bylaws on academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions" on two-time transfers. Pls'. Mem. at 13. They argue that "preventing in-season transfers" is sufficient to prevent "NCAA athletics from becoming a free agent market like those in professional sports," Pls'. Mem. at 13.

This claim is not supported by law, facts, or logic. Not even professional sports operate on a model of perpetual and unchecked free agency as Plaintiffs propose here. Plaintiffs' preferred rules would completely eliminate any team roster consistency important for student-athletes, prospective student-athletes, coaches, and fans. It would also eliminate any academic consistency for student-athletes. Research suggests that students (not just student-athletes) who transfer more

---

[3] Pretext may be relevant in employment cases. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The NCAA is unaware of this concept being applied in antitrust cases, and Plaintiffs cite nothing in support of this notion.

than once are less likely to attain a baccalaureate degree within six-years than non-transfer students or students who transfer only once.[4] It thus defies common sense to imagine that students who transfer three or four times are somehow in a better position to attain their degree or succeed academically. But this is the system Plaintiffs propose.

Plaintiffs' alternative approach is also contrary to the Supreme Court's guidance in *Alston*. The *Alston* Court noted "that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." *Alston*, 141 S. Ct. at 2161. The Court cautioned against proposals such as Plaintiffs':

> To the contrary, courts should not second-guess degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments of degrees of efficiency… That would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements.

*Id*. (internal quotations and citations omitted).

Plaintiffs have certainly imagined a purportedly less restrictive alternative, but they provide no factual or legal basis to support their contention that procompetitive purposes will be achieved through their perpetual and unchecked free agency model. This Court should not simply accept the Plaintiffs' assertion that seven states understand the dynamics of collegiate athletics better than the association created for that purpose.

---

[4] Renee M. Fauria & Matthew B. Fuller, *Transfer Student Success: Educationally Purposeful Activities Predictive of Undergraduate GPA*, 10 RPA J. 39, 40 (2015), https://files.eric.ed.gov/fulltext/EJ1064764.pdf ("Although transfer student completion rates are difficult to monitor, a trend of noncompletion is apparent. Transfer students are less apt to attain their baccalaureate degree in a given 6-year period than nontransfer students."); Shawn Jeffrey Waltz, *2+2: Academic Success Predictors of Two-Year Transfer Student Athletes*, University of New Orleans Theses and Dissertations, xvii (2022) https://scholarworks.uno.edu/cgi/viewcontent.cgi? article=4247&context=td ("Results of this research indicate transfer student athletes do not perform academically like their non-transfer, or native, peer athletes. Specifically, transfer students are slightly less likely to graduate than their native student athlete peers.").

### C.    Plaintiffs Provide No Legal Basis to Enjoin Enforcement of Bylaw 12.11.4.2.

Finally, Plaintiffs offer no factual or legal support for the argument that Bylaw 12.11.4.2, i.e., the Rule of Restitution, violates the antitrust laws. They do not make a single claim that Bylaw 12.11.4.2 has anticompetitive effects, or that it even constitutes a restraint of trade or commerce under the Sherman Act. 15 U.S.C. § 1. Plaintiffs' failure to proffer any legal arguments in favor of their position forecloses any finding of likelihood of success on their claim to enjoin enforcement of Bylaw 12.11.4.2. *See, e.g.*, *Wootten v. Commonwealth of Virginia*, 168 F. Supp. 3d 890, 895–96 (W.D. Va. 2016) ("[C]ourts widely agree that parties have the burden to present legal arguments in the first instance,"); *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 227 (D. Md. 2020) (finding plaintiff "makes reference [to certain constitutional violations]…but makes no legal arguments as to these claims, so the court will not address them here either") *aff'd in relevant part,* No. 20-2311, 2022 WL 1449180 (4th Cir. May 9, 2022).

## II.    Plaintiffs Have Not, and Cannot, Establish Irreparable Harm.

A plaintiff seeking preliminary relief must show more than a mere "possibility" of irreparable harm. *The Real Truth About Obama, Inc. v. Fed. Elections Comm'n.,* 575 F.3d 342, 346 (4th Cir. 2009). Moreover, the threatened harm must be "actual and imminent, not remote or speculative." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

Plaintiffs claim that college athletes in their respective states "are suffering and will continue to suffer irreparable harm" without immediate relief. Pls'. Mem. at 14. As evidence of this, Plaintiffs point to one example in West Virginia and two examples in Illinois. Pls'. Motion., Exs. B–D. Most Plaintiffs here, the states of Colorado, Ohio, North Carolina, New York, and Tennessee, provide no evidence of any threat of harm to student-athletes, let alone that which could be "actual and imminent." *Direx*, 952 F.2d at 812. In fact, neither Plaintiffs' motion or memorandum, makes any reference to events in those states at all.

As to the two Plaintiff states that do offer examples, West Virginia and Illinois, they provide no legal authority in support of the claim that a delay in athletic eligibility is sufficient to show irreparable harm. To the contrary, courts in the Fourth Circuit hold that temporary ineligibility from competition is not "irreparable harm." *See Gregor v. West Virginia Secondary Schools Athletic Commission,* No. 2:20-cv-00654, 2020 WL 5995075 at *3 (S.D. W.Va. Oct. 9, 2020) (TRO), No. 2:20-cv-00654, 2020 WL 6292813 (S.D. W.Va. Oct. 27, 2020) (PI) ("Other courts have found that students are not irreparably harmed even when the student is barred from competition for an entire season"). The law is even clearer in West Virginia, where athletic ineligibility *never* supports preliminary relief. *Hart v. Nat'l Coll. Athletic Assn.*, 550 S.E.2d 79, 86 (W. Va. 2001) ("Simply stated, a student's ability to participate in athletic contests is not a right recognized by the law of this State.").

Yet as best as one can tell from Plaintiffs' allegations, the only irreparable harm to student-athletes is a delay in eligibility. With respect to Mr. Battle, Plaintiffs allege:

> If [Mr. Battle] continues to be kept out of competition through December, then he would be missing seven additional games . . . . Once these games are played they are gone forever. Every passing game missed further irreparably harms Mr. Battle.

Compl. ¶ 50. In sum, Plaintiffs ask the Court simply to ignore that the irreparable harm they allege does not support their extraordinary request for preliminary relief.

## III.    The Balance of Equities Weighs Against an Injunction.

The balance of equities favors maintaining the status quo among the NCAA, its member schools, and its student athletes. Plaintiffs focus only on student-athletes' interest in playing more games *now* and, potentially, monetizing their collegiate-sports careers now and in the future. The NCAA, however, must also consider the academic success of its student-athletes and the success of collegiate athletics generally, and even Plaintiffs agree that these broader NCAA concerns

justify some transfer restrictions.

This Court should decline Plaintiffs' request—made without any evidentiary support—to rewrite NCAA carefully considered eligibility rules. The Rule aims to promote academic success by minimizing the significant potential disruption of multiple transfers, promote the benefits of team continuity and predictability, and protect the viability of collegiate sports by preserving some level of competitive balance between programs and some level of continuity in the makeup of teams. The Rule does not restrict a student-athlete's ability to receive athletic aid, practice, and travel with the team, or receive academic services. In addition to rules governing transfer, eligibility rules ensure that student athletes are actually enrolled at the school they represent, carry a minimum number of credit hours, attend classes, and meet minimum academic requirements. But Plaintiffs ask this Court to effectively extinguish the NCAA member schools' power to regulate transfers and protect its student athletes.

Maintaining the status quo poses little risk of harm to the Plaintiffs or the student athletes they have referenced in this proceeding. Each of the student-athletes Plaintiffs name in their Complaint remain eligible to play collegiate sports after the required year-off for academic integration. Plaintiffs submit no evidence that, even if the Court granted imposed the extraordinary relief Plaintiffs seek, the student-athletes identified in the Complaint would be more likely to succeed than they would after deferring their remaining years of eligibility by a single year. Plaintiffs speculate that each missed game presents a missed opportunity to obtain some *individual* benefit. But missed games also potentially create the opportunity for greater academic success, and unrestricted transfers unquestionably would damage both NCAA teams and collegiate sports generally. The Court has no basis to weigh the likelihood any potential effect of imposing Plaintiffs' preferred transfer rule.

On the other hand, imposing a new transfer rule on the NCAA would significantly harm the NCAA. Plaintiffs wrongly claim that the "connection between the [Transfer Eligibility] Rule and academic well-being or athletic amateurism is tenuous at best and is outweighed by the harm it does to college athletes and consumers of college athletics." Compl. ¶ 4. But Plaintiffs offer no evidence to dispute the NCAA's evidence that the Rule promotes academic well-being and fair play among the NCAA's member institutions and the student-athletes who compete. *See* Hataway TRO Decl. ¶¶ 9–14. Ordering that otherwise ineligible athletes can compete by definition disadvantages other student-athletes who would then lose opportunities to compete. And every institution granted a waiver from the Rules potentially gains an unfair advantage over those member schools who relied in good faith on current NCAA eligibility rules. *Id.* The NCAA member institutions set rules for eligibility and fair competition. If member-schools wanted to change those rules, they could have sought to do so. But they have not.[5]

## IV.   The Public Interest is Not Served Through an Injunction.

Finally, granting an injunction will harm the public interest. The public has no interest in unpredictable court-imposed changes to the NCAA eligibility rules. As plaintiffs concede, unlimited transfers would be detrimental to many NCAA teams and collegiate sports generally. But some transfers are beneficial to both student-athletes and collegiate sports. The NCAA devised the Rule to balance these competing concerns and has a process for considering and amending that balance after due consideration. The question here is whether the public has an interest in Plaintiffs' request that the Court armchair quarterback the NCAA's eligibility judgments. The answer is a resounding no. No public interest is served by district courts attempting to govern college athletics without the benefit of evidence.  Plaintiffs' Motion should be denied.

---

[5] It is notable that the Plaintiffs offer nothing from the schools in their states to support their claims.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiffs Motion for Temporary Restraining Order.

Dated: December 12, 2023

Respectfully submitted,

*/s/ Benjamin L. Bailey*
Benjamin L. Bailey (WVSB No. 200)
Christopher D. Smith (WVSB No. 13050)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bbailey@baileyglasser.com
csmith@baileyglasser.com

Stephen M. Scannell (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway Street, Suite 3600
St. Louis, MO 63102
(314) 259-2516 (phone)
(314) 259-2020 (fax)
Stephen.scannell@bclplaw.com

Philip D. Bartz (Admitted *Pro Hac Vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street NW, Suite 700
Washington, DC 20004
(202) 508-6000 (phone)
(202) 508-6200 (fax)
Philip.bartz@bclplaw.com

Benjamin J. Hogan (WVSB No. 12997)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203-5451
(303) 866-7000 (phone)
(303) 866-0200 (fax)
Ben.hogan@bclplaw.com

*Attorneys for Defendant National Collegiate Athletic Association*

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

STATE OF OHIO, STATE OF COLORADO,
STATE OF ILLINOIS, STATE OF NEW YORK,
STATE OF NORTH CAROLINA, STATE OF
TENNESSEE, AND STATE OF WEST                    Case No. 1:23-CV-00100
VIRGINIA

              Plaintiff,

   v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

              Defendant.

## CERTIFICATE OF SERVICE

I, Benjamin L. Bailey, do hereby certify that on 12th day of December 2023, I filed the

foregoing document titled *MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'*

*MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY*

*INJUNCTION* using the Court's CM/ECF system which will send notification to all counsel of

record.

                                   */s/ Benjamin L. Bailey*
                                   Benjamin L. Bailey (WVSB No. 200)